**WO**                                                                                              JL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DaJuan Torrell Williams, | No. CV-22-00154-PHX-MTL (CDB) |
| Plaintiff, | No. CV-22-01118-PHX-MTL (CDB) |
| | No. CV-22-01120-PHX-MTL (CDB) |
| v. | No. CV-22-01163-PHX-MTL (CDB) |
| Unknown Alvarez, et al., | |
| Defendants. | **ORDER** |

## I.  Procedural History

Plaintiff DaJuan Torrell Williams, who is currently confined in the Arizona State Prison Complex, Eyman Browning Complex, brought four civil rights actions pursuant to 42 U.S.C. § 1983.  On June 13, 2023, the Court consolidated the cases pertaining to Plaintiff's incarceration at the Yuma County Detention Center.[1]

On October 6, 2023, Defendants Julian Aguayo, Pedro Alvarez, Robert Arriola, Michael Cooper, Ana Duarte, Frank Duarte, Guadalupe Espinoza, M. Figueroa, Jose Flores, Tristan Gomez, Edgar Guerrero, Christopher Hand, Joy-anne James, Luis Lopez, Kelly D. Milner, Israel Navarro, Robert Oberosler, Daniel Perez, V. Quiroz, Rangel, Ramon Rendon, Thomas Ruelle, Corey Russom, Martin Sanchez, Crystela Silva, Kimberly Vargas, Wendell Walker, Leon N. Wilmot, Alejandro Zepeda, and Yuma County (the "County Defendants") filed a Motion for Summary Judgment on the merits of Plaintiff's

---

[1] Defendants refer to Plaintiff's cases in the order they were filed as *Williams #1*, *Williams #2*, etc.  The Court will do the same.

Eighth Amendment conditions-of-confinement, excessive force, and medical care claims; First Amendment claim regarding his mail; Sixth Amendment claim regarding access to counsel; and Fourth Amendment unreasonable search claim.  (Doc. 127.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), and he did not file a response. (Doc. 130.)

Defendant Bianca Acosta separately moves for summary judgment on the merits of Plaintiff's Eighth Amendment medical care claim.  (Doc. 120.)  Plaintiff was informed of his rights and obligation to respond, and he opposes the Motion.  (Doc. 154.)  Defendant Acosta filed a Reply.  (Doc. 159.)

The Court will grant Defendant Acosta's Motion for Summary Judgment and will grant in part and deny in part the County Defendants' Motion for Summary Judgment.[2]

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the nonmovant must then set forth specific facts showing that there is some genuine issue to defeat the motion.  *See* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir.

---

[2] The individual County Defendants filed a Motion for Summary Judgment on the merits of the individual-capacity claims in Counts Six and Seven of the Complaint in *Williams #3*. (Doc. 162.)  The Court will address that Motion for Summary Judgment in a separate Order.

2001).  "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial."  *Id.* (citations and quotations omitted).  The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment.  *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

Where a plaintiff is pro se, however, the Court must consider as evidence the contentions in the plaintiff's verified pleadings, "where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence."  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).  Furthermore, the Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly."  *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

A court "generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."  *Agosto v. INS*, 436 U.S. 748, 756 (1978); *see also Barnes v. Sea Haw. Rafting, LLC*, 889 F.3d 517, 538 (9th Cir. 2018) (Rule 56 "authorizes summary judgment only where . . . it is quite clear what the truth is") (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)).  Accordingly, at summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the Court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  "Reasonable doubts as to the existence of material factual issue are resolved against the moving part[y]."  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

Because Plaintiff did not file a response to Defendants' Motion for Summary Judgment or a controverting statement of facts, the Court will consider Defendants'

1    supported facts undisputed unless they are controverted by allegations in the verified
2    Complaint that are based on Plaintiff's firsthand knowledge or other evidence on the
3    record.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact
4    or fails to properly address another party's assertion of fact," the Court may "consider the
5    fact undisputed for purposes of the motion"); *Blanas*, 393 F.3d at 923.

6    **III.    *Williams #1 (CV-22-00154)***

7         **A.    Background**

8         Plaintiff has been in the custody of the Arizona Department of Corrections,
9    Rehabilitation and Reentry ("ADCRR") since 1999.  On March 10, 2020, Plaintiff was
10   transferred from ADCRR to the Yuma County Detention Center ("YCDC") to await trial
11   on new charges.

12        In *Williams #1*, Plaintiff named 41 Defendants in his First Amended Complaint.
13   (Doc. 17.)  The remaining Defendants in *Williams #1* are Yuma County; Sheriff Wilmot;
14   Psychiatric Nurse Practitioner ("PNP") James; Registered Nurse Vargas; Captain Milner;
15   Lieutenants Cooper and Ana Duarte; Sergeants Arriola, Ruelle, Walker, Silva, Gomez,
16   Guerrero, and Oberosler; Sheriff's Deputy Frank Duarte; and Detention Officers Figueroa
17   and Flores.  Briefly stated, Plaintiff alleges that on July 8, 2020, Defendants used excessive
18   force against him, forcibly injected him with psychotropic medication without his consent,
19   and placed him on "zero item status" for several months, all in violation of his Eighth
20   Amendment rights.  (Doc. 17 at 8-22.)  Plaintiff claims his placement on "zero item status"
21   also violated his First and Sixth Amendment rights.  (*Id.* at 23-29.)  Plaintiff sues each
22   individual Defendant in his or her individual and official capacities.  (*Id.* at 30.)  He seeks
23   declaratory, injunctive, and monetary relief.  (*Id.*)

24        On screening, the Court determined that Plaintiff stated an Eighth Amendment
25   claim in Count One against Defendant James for ordering involuntary and medically
26   unnecessary injections and against Defendants Acosta and Vargas for forcibly injecting
27   Plaintiff with the prescribed medications, without his consent.  (Doc. 19 at 11.)  The Court
28   also determined that Plaintiff stated an Eighth Amendment excessive force claim in Count

Three against Defendants Arriola, Deputy Duarte, Figueroa, Flores, Ruelle, Silva, Walker, Acosta, and Vargas. (*Id.* at 13.) The Court further determined that Plaintiff stated an Eighth Amendment policy claim in Count Four against Defendants Wilmot, Milner, Cooper, Duarte, Gomez, Guerrero, and Oberosler in their official capacities and individual-capacity Eighth Amendment conditions-of-confinement claims against Defendants Wilmot, Milner, Cooper, A. Duarte, Gomez, Guerrero, and Oberosler, for their alleged authorization of Plaintiff's placement on "zero item status." (*Id.*) The Court determined that Plaintiff stated a First Amendment claim in Count Five and a Sixth Amendment Claim in Count Six against Defendants Yuma County, Wilmot, Milner, Cooper, Duarte, Gomez, Guerrero, and Oberosler based on the allegation that they implemented or condoned the policy of "zero item status" and authorized Plaintiff's placement on such status. (*Id.* at 15.)

### B.     Plaintiff's Allegations

On July 8, 2020, Defendants Arriola, Deputy Duarte, Figueroa, Flores, Ruelle, Silva, Walker, Acosta, and Vargas "shoved [Plaintiff's] face and body into and against the concrete slab bunk areas and/or tightly applied leg shackles to [his] ankles and/or 4 pair of handcuffs to [his] wrist and forearm, cutting off [his] circulation and/or preventing [him] from moving and leaving [him] restrained in such a manner" in his cell, by himself. (Doc. 17 at 14.) Plaintiff was unable to drink water or use the restroom for more than three hours and Defendants refused to adjust the restraints, provide Plaintiff with water, or allow him to use the restroom. (*Id.*) Plaintiff was "not resisting or failing to comply in any manner," had already been subdued, was not screaming, yelling, or otherwise causing any disturbance, and was not a danger to himself or others. (*Id.*) Because of the restraints, he was unable to stand or move, did not have water for over five hours after "spending an hour in a steaming hot shower being dehydrated," and could not use the restroom. (*Id.*)

That same day, Defendants James and Vargas prescribed forced injections of psychotropic drugs for Plaintiff, specifically, "Benadryl 50mg IM stat" and "Haldol 5 mg, IM stat" every six hours for seven days. (Doc. 17 at 9.) The injections were ordered "without making any firsthand professional examinations" of Plaintiff, his medical records

and history, or his prison and institutional records, and without a court order. (*Id.*)

Between June 26 and September 2020, Plaintiff was placed "or maintained on" "zero item status," which means a prisoner is housed in a cell that has been stripped of a mattress, linens, bedding, and all property including clothing; receives a lower calorie diet consisting of "sack lunches," containing two lunchmeat sandwiches and a piece of fruit; has no telephone access or visitation, including legal calls and visits; is denied writing implements and paper and, therefore, "cannot write or fill out any jail required medical or other request forms or write or send out any mail"; and is locked down twenty-four hours per day, seven days per week. (*Id.* at 16-17.)

While Plaintiff was on zero item status, he was served "60 straight sack lunch meals for breakfast, lunch and dinner" over a 20-day period, causing him "to suffer severe hunger pains[,] particularly during the 13-hour period between dinner and breakfast where he was deprived of sleep[,] and suffered significant weight loss and constipation and irregular/irritable bowel movements, with blood in [his] stool." (*Id.*) For almost two months he was forced to walk, sit, and lay down on the cold concrete floor without footwear or proper clothing; was constantly cold; and, consequently, was deprived of meaningful sleep. Being forced to sleep on concrete aggravated a July 8, 2020 shoulder injury and caused him excruciating pain from his previously diagnosed "degenerative joint disorder" in his lower spine. (*Id.* at 18.)

Plaintiff also was denied hygiene products and regular showers, and for over 120 days, was not given any outdoor recreation or exercise. (*Id.* at 18-19.) Plaintiff suffered anxiety, lethargy, and muscle atrophy as a result. (*Id.*) For 45 days, all of Plaintiff's legal and personal mail was withheld, he was not allowed to write or contact anyone by mail or phone, and he was denied visitation. (*Id.* at 19.)

Plaintiff was again placed on zero item status from April 9, 2021 to June 2021, as punishment for allegedly being found in possession of contraband. (*Id.* at 20.) Plaintiff was denied a mattress or bedding for 20 days and "missed numerous court deadlines over the 4 active cases [he had] going on at the time in which [he] was self-represented." (*Id.*)

From November 8 to 22, 2021, he was left in his cell without a blanket or footwear as punishment for a "cell entry" where he "allegedly refused to surrender handcuff restraints." (*Id.*)  Plaintiff was forced to walk on an "ice cold floor" in bare feet and to "curl up into a ball, tucking [his] arms inside of shirt sleeves for warmth and to protect [himself] from extremely cold temperatures in his cell."  (*Id.*)

### C.    Defendants' Facts

#### 1.    Background

Inmates[3] housed in Special Management Unit F Housing Unit are classified as high-risk inmates who have documented institutional violence (either at YCDC or other facilities), inmates with behavioral problems who demonstrate violent behavior, and inmates who have assaultive behaviors toward staff or other inmates.  (County Defendants' Statement of Facts ("CDSOF"), Doc. 128 at 35 ¶ 214.)  These inmates can be housed in either the F1 or F2 units.  (*Id.*)  F1 is YCDC's most restrictive unit and houses inmates who have a history of disruptive and aggressive behavior towards staff.  (*Id.*)

Plaintiff arrived at YCDC on April 17, 2020 and was classified and housed in F1.  (*Id.* ¶ 233.)  Based on Plaintiff's ADCRR Maximum Security classification, previous assaults on staff and other prisoners at ADCRR, and life sentence, Plaintiff did not qualify to be housed in general population at YCDC.  (*Id.*)  Plaintiff was housed in F1 for most of his time at YCDC.  (*Id.* at ¶¶ 233-36.)

Due to Plaintiff's history and classification upon arrival to YCDC, he was required to be escorted by two officers.  (*Id.* ¶ 234.)  Subsequently, because of Plaintiff's continued assaultive behaviors and demonstrated history of manufacturing and concealing weapons and contraband, Plaintiff was placed on "four man" status upon his cell door opening.  (*Id.* ¶ 237.)  This meant that three officers and a supervisor would be present whenever Plaintiff's cell door was opened.  (*Id.*)

At the relevant time, Policy 403.1-403.5 and 408.1-408.3 contained the Yuma

---

[3] The Court uses the term "inmates," as used in YCDC policy, to encompass both convicted prisoners who are awaiting trial on new charges, like Plaintiff, and pretrial detainees.

County Sheriff's Office ("YCSO") use of force policy. (*Id.* ¶ 6.) Under the use of force policy, "Officers must consider the totality of circumstances in evaluating whether force is necessary and what level of force would be reasonable before using a particular force option." (Doc. 128-3 at 62.) Factors that may be considered include, but are not limited to, "[t]he risk and reasonably foreseeable consequences of escape," "[t]he conduct of the individual being confronted as reasonably perceived by the officer at the time," "[t]he seriousness of the suspected offense or reason for contact with the individual," "[t]he officers' and subjects' personal factors", "[t]he influence of drugs or alcohol and the mental capacity of the subject", "[t]he proximity of weapons," "[t]he distance of the subject to the officer," and "[t]he degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained." (*Id.* at 62-63.)

Use of force options include officer presence, verbal commands, control holds that have minimal chance of injury, chemical agents (such as Oleoresin Capsicum Aerosol spray), limited strikes to targeted areas, strikes that have more than a minimal chance of injury (such as kicks, elbow, palm, heel, knee, fist strikes), conducted electrical weapons ("CEWs"), impact weapons, and deadly force. (*Id.* at 63-64.) Chemical agents are intended to be used as a lesser means of obtaining control. (*Id.* at 64.) With respect to strikes, the officer must consider the totality of the circumstances in evaluating which area of the body is reasonable to strike. (*Id.*) Generally, CEWs should only be considered in circumstances where a reasonable officer would believe that it is immediately necessary to protect him/her or another from what that officer reasonably believes is an imminent or actual assault, to prevent suicide, or in excited delirium cases. (*Id.*)

Levels of resistance include passive resistance, or physical actions by a subject that do not prevent an officer's attempt at control; psychological intimidation; active resistance, which means "[p]hysical actions on the part of a subject who is ignoring verbal commands and actively attempting to prevent the officer's control, but do not constitute an assault," such as ignoring the officer's verbal commands and pulling away, hiding behind/under objects, pinning arms under the body, thrashing around, body going rigid, or assuming a

fighting stance; danger to self; active aggression, or assault with non-deadly force; and aggravated active aggression, or assault with deadly force.  (*Id.* at 64-65.)

### 2.      July 8, 2020, Incident

At 10:10 a.m. on July 8, 2020, Defendant Flores and non-party Officer Vasquez escorted Plaintiff from the shower to his cell in the F1 Unit.  (CDSOF ¶ 9; Decl. of J. Flores, Doc. 128-3 at 112 ¶ 5.)  Defendant Flores and Officer Vasquez escorted Plaintiff using an "escort hold," with one officer on each side.  (CDSOF ¶ 9)  An escort hold is a method used at YCSO to maintain control over a high-risk inmate by holding the triceps area of the arm.  (*Id.*)  At the time, Plaintiff was on mandatory supervisor status, which required a supervisor to be present in the area any time he was being escorted.  (*Id.* ¶ 10.)  Upon arriving at Plaintiff's cell, Defendant Flores conducted a pat search of Plaintiff's right side.  (*Id.* ¶ 11.)  Officer Vasquez then started a pat search of Plaintiff's left side.  (*Id.*)

As Officer Vasquez searched Plaintiff's waistline, Plaintiff headbutted Vasquez in the face.  (*Id.*)  A purple toothbrush that had been sharpened to a point fell from Plaintiff's waistband.  (*Id.* ¶ 13; Doc. 128-3 at 95-97, 99.)  Defendant Flores and Officer Vasquez and Plaintiff fell to the ground, and as soon as they hit the ground, Defendant Walker immediately directed Defendant Flores and Officer Vasquez to pick up Plaintiff and place him inside his cell.  (CDSOF ¶ 14.)

Officer Vasquez was directed to leave the unit to seek medical attention for his injury and Defendant Ruelle took over control of Plaintiff's left side.  (*Id.* ¶ 15.)  Plaintiff was placed in his cell kneeling with both knees on the ground, facing the wall with his head laying on the concrete bed.  (*Id.* ¶ 16.)  Defendant Figueroa arrived and applied leg and waist restraints to Plaintiff.  (*Id.* ¶ 17.)  Defendant Figueroa gave verbal commands to Plaintiff to stop resisting, but Plaintiff did not comply.  (*Id.*)  Defendant Figueroa repeatedly gave repeat verbal commands to Plaintiff, and as Figueroa applied the leg restraints, Plaintiff tensed up and kicked his feet.  (*Id.*)  Plaintiff kept attempting to pull away and resisting while the restraints were being applied.  (*Id.*)  The restraints were double locked to prevent any manipulation by Plaintiff.  (*Id.*)  Defendant Flores assisted by maintaining

control of Plaintiff while officers applied the leg and waist restraints to Plaintiff.  (*Id.*) Defendant Ruelle assisted officers in maintaining control of Plaintiff to allow officers to apply leg and waist restraints to Plaintiff.  (*Id.*)

Defendants Arriola and Silva then arrived and entered Plaintiff's cell. (*Id.* ¶ 18.) Defendant Arriola saw multiple officers maintaining control of Plaintiff while Plaintiff's upper body was on the bed and his legs were off the bed.  (*Id.* ¶ 19.) Plaintiff was fully restrained with leg restraints, waist restraints, and hand restraints.  (*Id.*)  Defendant Arriola verbally commanded Plaintiff to comply with his orders or Plaintiff would be tased.  (*Id.*) Although Plaintiff was fully restrained, he continued to resist and attempt to pull away from the officers.  (*Id.* ¶ 20.)  Defendant Arriola then cycled his taser "for display only." (*Id.*)  Arriola noticed the toothbrush on the floor and directed that all items be removed from Plaintiff's cell and his cell be searched for contraband and weapons.  (*Id.* ¶ 21.)

Defendant Ruelle completed an additional pat search of Plaintiff to ensure there were no additional concealed weapons.  (*Id.* ¶ 22.)  A large pencil was found in his sock. (*Id.*; Doc. 128-3 at 92-93, 98-99.)  Defendant Arriola then directed all clothing to be removed from Plaintiff.  (CDSOF ¶ 22.)  Defendant Arriola directed Defendant Ruelle to use a rescue tool to cut off Plaintiff's shirt and pants.  (*Id.*)  A rescue tool is a curved blade cutting tool.  (*Id.*)  Plaintiff resisted and attempted to pull away while his clothes were being removed.  (*Id.* ¶ 23.)

After Plaintiff's clothing was removed, he was placed kneeling down and directed to not move.  (*Id.* ¶ 24.)  Defendant Arriola directed the officers to exit Plaintiff's cell one by one, which they did.  (*Id.*)  Plaintiff remained in his cell with leg and waist restraints applied.  (*Id.* ¶ 25.)

Approximately 30 minutes later, Defendant Ruelle returned to Plaintiff's cell with Defendants Deputy Duarte, Figueroa, Acosta, and Vargas.  (*Id.* ¶ 26.)  Deputy Duarte interviewed Plaintiff regarding the officer assault that had occurred and read Plaintiff his

*Miranda*[4] rights.  (*Id.* ¶ 27.)  Plaintiff stated he "feared for his life from the officers and then requested to speak with his attorney."  (Doc. 128-3 at 130.)  Plaintiff also stated that he had lost feeling in his legs and hands.  (*Id.*)

Because Plaintiff remained restrained, Defendants Acosta and Vargas completed a medical evaluation of Plaintiff.  (CDSOF ¶ 29.)  Defendant Acosta called Defendant James, who was employed by Wellpath as a PNP to provide tele-psychiatric services at YCDC.  (Doc. 128-4 at 3 ¶ 9.)  As a PNP, James's job duties consisted of providing psychiatric services to patients, including prescribing psychotropic medications as necessary.  (*Id.* ¶ 10.)

Acosta informed James of the incident and described Plaintiff's current behavior and medical/institutional history.  (CDSOF ¶ 52.)  Acosta described Plaintiff as "agitated, combative, and physically aggressive" and noted he currently required restraints to be controlled due to his severe agitation.  (*Id.*)  Acosta informed James that Plaintiff had to be fully restrained for medical staff to assess him and, even then, their attempts were unsuccessful.  (*Id.*)  Acosta also told James that this was Plaintiff's second aggressive attack on an officer in less than two weeks.  (*Id.*)

Defendant James ordered the use of emergency psychotropic medications, Benadryl and Haldol.  (*Id.* ¶¶ 54-55.)  Defendant James prescribed Benadryl to prevent any side effects that might occur with Haldol.  (*Id.* ¶ 55.)  YCDC's policy regarding emergency psychotropic medication states that "the use of forced psychotropic medication will be considered only in an emergency situation whereby an inmate poses a threat to themselves or others." (Doc. 128-4 at 12.)  The policy provides that psychotropic medications will be administered only upon written order of the responsible physician and when all other less restrictive or non-intrusive measures have been attempted and have been deemed by the physician to be inadequate.  (*Id.*)  Forced psychotropic medications will not be used simply to control behavior or as a disciplinary measure.  (*Id.*)

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

After receiving Defendant James's order, Defendants Acosta and Vargas simultaneously administered an injection of medication into each of Plaintiff's buttocks to assist with Plaintiff's agitation and continued aggressive behavior toward the officers. (*See* CDSOF ¶ 29.)  After the medication was administered, Plaintiff was placed kneeling on top of his bed. (*Id.*)

Shortly after the medication was administered, Defendant Ruelle and another officer removed Plaintiff's restraints, beginning with the hand restraints attached to the waist restraints and then the leg restraints. (*Id.* ¶ 30.)  After the leg and waist restraints were removed, Plaintiff was assisted to kneel on the floor with his chest on the edge of his bed and he was directed to remain there until the door was secured. (*Id.* ¶ 31.)  The only restraints that remained on Plaintiff were the hand restraints. (*Id.*)  After all the officers exited the cell, the cell door was secured. (*Id.* ¶ 32.)  Once the door was secured, Plaintiff approached the door and placed his hands out of the wicket door to have his hand restraints removed. (*Id.*)  No injuries to Plaintiff were reported, and he had the restraints on for less than an hour. (*Id.* ¶¶ 33-34.)  Photographs of Plaintiff's body were taken, which showed no visible injuries. (Doc. 128-3 at 100-09.)

Plaintiff was monitored by the nursing staff by regularly checking his vital signs. (CDSOF ¶ 58.)  Plaintiff had no adverse reaction to the administration of the Haldol and Benadryl. (*Id.*)  Defendant James placed Plaintiff on suicide watch. (*Id.* ¶ 60.)  Defendant James also prescribed Haldol 5mg by mouth every six hours as needed due to agitation for seven days and Benadryl 50mg by mouth every six hours as needed due to agitation for seven days, but Plaintiff refused these medications. (*Id.* ¶ 61.)  Because Plaintiff's behavior stabilized after one use, Defendant James did not further order that any medications be administered to Plaintiff without his consent. (*Id.*)

Defendant Walker reviewed the incident for compliance with policy and the standard of care but was not otherwise personally involved in the incident and never physically touched Plaintiff or placed restraints on him. (*Id.* ¶¶ 7-8.)  No Use of Force Report was completed "because there was no use of force utilized." (*Id.* ¶ 40.)

### 3. Conditions of Confinement/Zero Item Status

F1 inmates have access to the same items as every other inmate, but the item "may look different to ensure the safety and security of the facility and curtail the concealment and manufacturing of weapons." (*Id.* ¶ 221.) For example, the toothbrushes are "finger instead of plastic"; toothpaste and soap are dispensed in single-use packets instead of a tube or a bar; deodorant is travel rather than full sized; small or rubber pencils instead of full-length; and food trays are rubber instead of plastic. (*Id.* ¶ 222.)

F1 inmates are not restricted in their ability to communicate and have access to the same methods of communication that other inmates have, although the communication device may be presented differently to ensure the safety and security of the facility. (*Id.* ¶ 223.) In F1, the telephone is on a kiosk that is rolled between the cells in each unit for inmates to make personal and legal calls. (*Id.* ¶ 224.) F1 inmates may use a tablet for email communications, submitting grievances, or completing legal research. (*Id.* ¶ 225.) The tablet is rolled between cells; F1 inmates are not permitted to have tablets in their cell. (*Id.*) F1 inmates can send and receive mail (personal and legal) just like all other inmates at YCDC. (*Id.* ¶ 226.) Although F1 inmates are not permitted to keep every piece of mail in their cell at one time, they may exchange pieces from their personal bin. (*Id.*) F1 inmates have access to pencils and a few sheets of paper at a time. (*Id.* ¶ 227.)

Meals in F1 are typically provided on rubber or Styrofoam trays, but inmates may receive sack meals if necessary for safety or security reasons. (*Id.* ¶ 228.) F1 inmates are provided sandals. (*Id.* ¶ 229.) An inmate is permitted to have his shoes in his cell with him, unless specific security and safety concerns are presented. (*Id.*) F1 inmates are provided with a high security mattress and a wool or quilt blanket. (*Id.* ¶ 230.) Quilt blankets are more difficult to rip, destroy, or manipulate. (*Id.*) The high security mattresses are made of special material that prevents ripping or other types of destruction or manipulation. (*Id.*)

F1 inmates are offered recreation at set times, unless specific disciplinary sanctions require otherwise. (*Id.* ¶ 231.) If an inmate wants to attend recreation, he must make a

1    request to an officer during the scheduled time.  (*Id.*)  Showers are provided to F1 inmates
2    every three days regardless of disciplinary status.  (*Id.* at 232.)

3            YCDC does not have a "zero item status" policy.  (*Id.* ¶ 238.)  Due to safety and
4    security concerns posed by F1 inmates, they are not permitted to possess an unlimited
5    number of items in their cell.  (*Id.* ¶ 216.)  Rather, F1 inmates are permitted to have their
6    clothing, bedding, hygiene products, small allotments of personal items, and pencils in their
7    cells. (*Id.*)  F1 inmates are not permitted to possess two of the same items at the same time.
8    (*Id.* ¶ 217.)  This restriction, known as "one for one" status, "helps control and track the
9    number of items that are in a cell at one time and is proactive in curtailing the
10   manufacturing and concealing of contraband, including weapons." (*Id.* ¶¶ 218, 220.)  Each
11   F1 inmate has his own personal item bin, which is stored at the front of the unit.  (*Id.* ¶ 219.)
12   The personal item bin holds the additional items an inmate has access to but cannot keep
13   in his cell.  (*Id.*)  If an inmate wants to access an item from his bin, he can request an item
14   exchange from any officer.  (*Id.*)

15           Due to specific safety, security, or disciplinary reasons, the "one for one" status may
16   be applied more restrictively, whereby an inmate may only be permitted to possess one
17   item in his cell at a time.  (*Id.* ¶ 220.)  However, the inmate is given all items necessary to
18   use the one item he selects to have in his cell.  (*Id.*)  For example, if the inmate selects his
19   toothbrush, toothpaste is provided at that time.  (*Id.*)  If an inmate selects a pencil, paper is
20   also provided at that time.  (*Id.*)

21           After the July 8, 2020, incident, Defendant Cooper authorized Plaintiff to be on
22   "restrictive one for one" status, which meant he would only be permitted one item in his
23   cell at a time.  (*Id.* ¶ 253.)  The decision whether to place an inmate on "restrictive one for
24   one" status is subjective and made on an individual basis based on the inmate's behaviors
25   and actions, such as assaulting staff or other inmates, tearing up paper items that are
26   contained in his cell, using all items in his cell in a destructive manner, or using the items
27   in his cell to prevent visualization or access by the staff to the cell.  (*Id.* ¶ 239.)  F1 inmates
28   are never completely denied access to their belongings.  (*Id.* ¶ 240.)  Regardless of whether

the inmate is on "restrictive one for one status" or regular "one for one" status, he is always provided a blanket and mattress at night for collection in the morning.  (*Id.* ¶ 241.)

While Plaintiff was on "restrictive one for one" status, he was given his mattress and blanket at night, which were retrieved by officers the next morning.  (*Id.* ¶ 254.) Plaintiff was never denied his clothing and had his standard issued uniform top and pants. (*Id.* ¶ 255.)  Plaintiff was permitted to have sandals like other F1 inmates.  (*Id.*)  If Plaintiff was not permitted to have his sandals inside his cell due to his behaviors and actions, the sandals would remain outside of his cell and given to him for any movement outside his cell.  (*Id.*)

All F1 inmates are permitted to shower every three days, even those on "restrictive one for one" status.  (*Id.* ¶ 256.)  Plaintiff had access to his toothbrush, toothpaste, a comb, liquid soap, and deodorant at all times.  (*Id.*)  If Plaintiff wanted recreation time, he needed to ask the officers and it would have been provided to him.  (*Id.* ¶ 257.)

While he was on "restrictive one for one" status, Plaintiff's legal and personal mail were never withheld.  (*Id.* ¶ 258.)  Any mail that Plaintiff received (legal or personal) would be shown to him and then placed in his bin in the front of the unit.  (*Id.*)  Plaintiff could also access his mail on "restrictive one for one" status, but, just as with any other item, if he wanted to have a piece of mail in his cell, he was not permitted to possess any other item, until that piece of mail was returned.  (*Id.*)  Plaintiff was not denied access to communications (telephone, mail, visitation) while on "restrictive one for one" status, except if Plaintiff also was on disciplinary sanctions, and he lost his privileges to personal phone calls or visitation, he would not have had access to those specific communication avenues for the duration of the sanction.  (*Id.* ¶ 259.)  Plaintiff had access to the phone kiosk in the F1 unit and could use the phone for personal or legal calls.  (*Id.*)  Plaintiff was given calling cards to allow him to make his calls.  (*Id.*)

Plaintiff had access to writing materials when he was on "restrictive one for one" status.  (*Id.* ¶ 260.)  If Plaintiff wanted to write a letter, he would be provided a pencil (rubber or golf size) and paper to write.  (*Id.*)  Even if Plaintiff was restricted from having

a pencil in his possession due to his behavior, he could have requested an officer assist him with writing a letter, completing a grievance, or completing any other request.  (*Id.* ¶ 261.) Special arrangements were made that allowed Plaintiff access to a tablet to observe the funeral of a family member via video.  (*Id.* ¶ 262.)

Plaintiff was provided with three sack meals a day for approximately three weeks from the end of June 2020 until mid-July 2020, following the two officer assaults.  (*Id.* ¶ 263.)  There was a safety concern with providing a food tray to Plaintiff because a food tray requires the wicket door to remain open.  (*Id.*)  Instead, the sack meals were provided through the wicket door of his cell and allowed the officers to immediately close the wicket door after placing in the meal.  (*Id.*)  Plaintiff's sack meals were created by a dietician to ensure he was still provided with meals that meet the necessary dietary requirements.  (*Id.* ¶ 264.)  In approximately mid-July 2020, Plaintiff no longer required his meals to be served as sack meals, and Plaintiff was then provided meals on a rubber or Styrofoam tray.  (*Id.* ¶ 265.)

After Plaintiff was discovered with a piece of metal that was sharpened like a knife on April 9, 2021 and an incident on April 12, 2021, he was placed on restrictive one for one status until sometime in June 2021.  (*Id.* ¶¶ 266-67.)  Following an incident on November 8, 2021,[5] Plaintiff again was placed on restrictive one for one status, until November 22, 2021.  (*Id.* ¶ 268.)  Each time Plaintiff was on "restrictive one for one" status, as he demonstrated behavior changes and it was determined that he could be trusted to possess more than one item at a time, his "restrictive one for one" status was modified to allow him access to the same items in his cell as other F1 inmates.  (*Id.* ¶ 269.)

### D.   Official Capacity Claims

A suit against a defendant in his or her official capacity represents only another way of pleading an action against the entity that employs the defendant.  *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  That is, the real party in interest is not the named defendant,

---

[5] The April 12, 2021, and November 8, 2021, incidents are the subjects of Plaintiff's excessive force claims in *Williams* # 4 and are discussed in detail below.

but the entity that employs the defendant.  *Id.* at 166.  To bring a claim against an individual in his official capacity, a plaintiff must show that the constitutional deprivation resulted from the entity's policy, custom, or practice.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Plaintiff names the individual Defendants in their individual and official capacities.  The real party in interest for the official capacity claims is Yuma County, the entity that employs the individual Defendants.  Plaintiff's official-capacity claims against the individual Defendants are therefore duplicative of his claims against Yuma County.  The Court will dismiss Plaintiff's official-capacity claims against the individual Defendants.

## E.     Excessive Force

### 1.     Legal Standard

Use of excessive force against a prisoner violates the prisoner's Eighth Amendment right to be free from cruel unusual punishment.  *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989).   The use of force is constitutional if it is used in a good faith effort to keep or restore discipline; it is unconstitutional if it is used "maliciously and sadistically for the very purpose of causing harm."  *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).  Thus, not "every malevolent touch by a prison guard gives rise to a federal cause of action," and de minimis uses of physical force do not offend the Constitution, provided the use of force is not "repugnant to the conscience of mankind.".  *Hudson v. McMillan*, 503 U.S. 1, 9-10 (1992).

A court considers five factors in determining whether a defendant's use of force was malicious and sadistic for the purpose of causing harm:  (1) the extent of the injury, (2) the need for force, (3) the relationship between the need and the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force.  *See id.* at 7 (citing *Whitley*, 475 U.S. at 321).   "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  *Whitley*, 475

U.S. at 321. When reviewing these factors, the Court must remember that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

Excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). Therefore, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* Nonetheless, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury." *Whitley*, 475 U.S. at 322.

## 2.    Analysis

County Defendants argue that Defendants Arriola, Deputy Duarte, Figueroa, Flores, Ruelle, Silva, and Walker did not use excessive force against Plaintiff during the July 8, 2020, incident, and Plaintiff suffered no injury. (Doc. 127 at 16-18.) Defendants contend their use of control techniques and escort holds did not violate the Eighth Amendment because the techniques were "necessary to control Plaintiff after he assaulted an officer and weapons were discovered on his person"; Defendants "reasonably perceived a threat" given Plaintiff's conduct; "the actions were not force and therefore could not have been excessive"; and Plaintiff was noncompliant with efforts to obtain compliance through verbal commands. (*Id.* at 18.)

First, Defendants have presented evidence that Defendant Walker was not personally involved in the July 8, 2020 incident and instead only reviewed the incident for compliance with YCSO's use of force policy and the standard of care. (CDSOF ¶ 7.) Plaintiff has not presented any evidence to rebut Defendants' evidence that Walker was not personally involved in the July 8, 2020 incident. Accordingly, Plaintiff cannot prevail on

an excessive force claim against Walker as to the July 8, 2020 incident.

Second, Defendants argue that Defendants Deputy Duarte, Arriola, and Silva used no force at all against Plaintiff.  (*Id.* at 17.)  During his deposition, Plaintiff testified that Deputy Duarte, Arriola, and Silva did not touch him.  (Doc. 128-4 at 102-03, 107.)  However, officers can be held liable for excessive force on a theory of integral participation "if they participate 'in some meaningful way' in the specific actions that constituted the violation."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (quoting *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004)).  Plaintiff testified that Deputy Duarte "was just present" for the injection and afterward, Duarte read Plaintiff his rights and tried to question him.  (Doc. 128-4 at 103.)  Plaintiff testified that Silva "was just the person [he] kept asking for water."  (*Id.* at 107.)  Deputy Duarte and Silva cannot be held liable for excessive force on an integral participation theory based on this conduct.  Deputy Duarte and Silva are entitled to judgment as a matter of law with respect to Plaintiff's excessive force claim.

With respect to Defendant Arriola, Plaintiff testified that Arriola "was in command of the incident," gave orders, and "direct[ed] the officers what to do," specifically, to "get [Plaintiff] off the ground; to take [him] in the cell; to cut [his] clothes off; to put four -- pair of handcuffs on [him]; and to chain [him] up and cuff [him] up and lay [him] in the middle of the floor."  (*Id.* at 102-03.)  If the conduct Defendant Arriola ordered Defendants Flores and Ruelle to engage in amounted to excessive force, Arriola could be held liable on an integral participation theory.

Defendants Flores used an escort hold to assist Plaintiff to his cell and conducted a pat search, neither of which constitutes excessive force.  *See Whitley*, 475 U.S. at 320-21.  During the pat search, Plaintiff headbutted Officer Vasquez in the face, and a toothbrush that had been sharpened to a point fell from Plaintiff's waistband.  Defendant Figueroa applied leg and waist restraints to Plaintiff, while Defendants Flores and Ruelle assisted in maintaining control of Plaintiff.  Defendants have presented evidence that Plaintiff was resisting their attempts to restrain him by pulling away from them and kicking his legs.

Accepting as true Plaintiff's allegations that he was not resisting, application of restraints to subdue a prisoner who assaults an officer, standing alone, does not violate the Eighth Amendment.

Defendant Arriola verbally commanded Plaintiff to comply with his orders or he would be tased and "cycled his taser for display only."  Even if Plaintiff was not resisting, displaying the taser was not unreasonable because Plaintiff continued to disregard officers' commands.

Defendant Ruelle used a cutting tool to cut off Plaintiff's clothing to search for additional weapons when a sharpened toothbrush fell from his clothing.  Assuming cutting off clothing to search for weapons constitutes force under the Eighth Amendment, the force was reasonable because officers had already discovered a weapon hidden in Plaintiff's clothing. As such, they had a reasonable basis for searching for additional hidden weapons, and Plaintiff could not remove his own clothing since he was restrained.

With respect to the restraints, in their Statement of Facts, Defendants acknowledge that Plaintiff told them he lost feeling in his legs and hands because the restraints were too tight.  In his Declaration, Defendant Ruelle states that Deputy Duarte interviewed Plaintiff, and Plaintiff told Deputy Duarte that he "lost feeling in his legs and hands due to the restraints." (Doc. 128-3 at 138 ¶ 25.)  In a report following the incident, Defendant Ruelle wrote that when Deputy Duarte interviewed Plaintiff, Plaintiff "alleged that he had lost feeling in his legs and hands."[6]  (*Id.* at 156.)  The Court also must accept as true the allegations in the verified Complaint that the shackles and handcuffs cut off his circulation, and Defendants refused to adjust the restraints, although Plaintiff does not state which Defendant he told that the shackles and handcuffs cut off his circulation.  Defendants' perception that Plaintiff had ample room between the restraints to allow for circulation is insufficient to refute Plaintiff's assertion, based on his personal knowledge, that the restraints were too tight, and he lost feeling in his legs and hands as a result.  That said, there is no evidence that Plaintiff suffered any injury beyond a brief loss of circulation in

---

[6] Defendants did not submit a Declaration from Deputy Duarte.

his legs and hands.  On this record, the Court cannot conclude that Plaintiff suffered more than a de minimis injury because the restraints were too tight. *See McMillan*, 503 U.S. at 9-10.

In short, even viewed in the light most favorable to Plaintiff, the evidence does not support "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.  There are no genuine disputes of material fact regarding whether Defendants used excessive force against Plaintiff during the July 8, 2020 incident.  The Court will therefore grant Defendants' Motion for Summary Judgment as to Count Three.

### F.    Forced Injection (Count One)

In Count One, Plaintiff alleges the injections were a means of punishment and humiliation.  (Doc. 17 at 9.)  He claims the injections caused him humiliation and anxiousness, rendered him unconscious, caused him to develop an uncontrollable twitch in his eyelids, and led to him seeking mental health care for trauma.  (*Id.*)

### 1.    Legal Standard

To prevail on an Eighth Amendment medical claim, a prisoner must demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to this analysis: an objective prong and a subjective prong.  First, as to the objective prong, a prisoner must show a "serious medical need."  *Id.* at 1096.  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (quoting *Estelle*, 429 U.S. at 104).

Second, as to the subjective prong, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  To satisfy the knowledge component, the official must both "be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay, or intentionally interfere with medical treatment,'" *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992) ), or when they fail to respond to a prisoner's pain or possible medical need, *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *see Estelle*, 429 U.S. at 106 (negligence does not rise to the level of a constitutional violation).  Further, a mere difference in medical opinion does not establish deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety.  *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Lab'ys.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983).  A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference.  *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.  The action must rise to a level of "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 105.  Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096.

### 2.   Defendant James

The evidence shows that because of Plaintiff's agitation, Defendants Acosta and Vargas could not complete a medical assessment. Acosta called Defendant James to determine the best alternative. Acosta told James that Plaintiff was "agitated, combative,

and physically aggressive," had to be fully restrained for medical staff to assess him, and that this was Plaintiff's second aggressive attack on an officer in less than two weeks. (CDSOF ¶ 52.)

Defendant James ordered Haldol and Benadryl to be administered intramuscularly to accelerate their effects due to the emergent situation. (Doc. 128-4 at 5 ¶ 21.) It is true that James did not physically observe or examine Plaintiff before she ordered the forcible administration of a psychotropic medication. However, James declares that Acosta's description of Plaintiff's "agitated behavior, paranoid statements, and recent history of violence was extremely concerning," and she concluded this was "a serious situation that, unless immediately deescalated, could result in injury to Plaintiff or others" and warranted emergency use of psychotropic medication in accordance with YCDC policy. (Id. at 3 ¶ 13, 5 ¶ 19.) James further avers that it is "common practice (which complies with the standard of care) for on-call and remote providers to authorize the ordering of such medications telephonically based upon the reports of others." (Id. at 5-6 ¶ 23.) James declares that in her professional opinion, due to the risk of Plaintiff harming himself or Defendants Acosta and Vargas during his medical evaluation and the risk of harm associated with removing the restraints from Plaintiff to lock him in his cell, "there were no less restrictive means that could have been taken in this incident." (Id. at 6 ¶ 25.)

The evidence demonstrates that Defendants James's decision to order Haldol and Benadryl to be administered without Plaintiff's consent and without having examined or personally assessed Plaintiff was not deliberately indifferent. Defendant James was not present at YCDC, and it was not unreasonable for her to rely on Defendant Acosta's description of the incident and Plaintiff's behavior and mental state in deciding to order emergency use of psychotropic medication. That James ordered Benadryl to mitigate possible side effects of the Haldol indicates she was not deliberately indifferent to Plaintiff's serious medical needs. Defendant James ordered additional doses of Haldol and Benadryl by mouth every six hours as needed for seven days, but because Plaintiff's behavior had stabilized, James did not order any further forcible administration of the

medication.  There is no evidence in the record that ordering forcible injections of Haldol and Benadryl was medically unacceptable under the circumstances.  *See Jackson*, 90 F.3d at 332.  On this record, there are no genuine disputes of material fact regarding whether Defendant James was deliberately indifferent to Plaintiff's serious medical needs.

### 3.   Defendant Vargas

The evidence demonstrates that Defendant Vargas administered one of the injections into Plaintiff's buttocks and had no other physical contact with Plaintiff.  (Doc. 128-3 at 195 ¶¶ 11, 15.)   As a Registered Nurse, Vargas could not prescribe medications and could not modify or refuse prescription orders.  (*Id.* ¶ 13.)  It was not unreasonable for Vargas, as a Registered Nurse, to rely on the decision of a Psychiatric Nurse Practitioner to order forcible administration of Haldol and Benadryl.  Furthermore, Vargas monitored Plaintiff for an hour after the injections were administered.  (*Id.* ¶ 12.)  There is no evidence that Vargas was aware of any side effects Plaintiff experienced because of the injections.  On this record, no reasonable jury could conclude that Vargas was deliberately indifferent to Plaintiff's serious medical needs.  There are no genuine disputes of material fact regarding whether Defendant Vargas violated Eighth Amendment rights.

For the foregoing reasons, the Court will grant the County Defendants' Motion for Summary Judgment as to Count One.

### 4.   Defendant Acosta

In her Motion for Summary Judgment, Defendant Acosta argues that she followed a valid order from a medical provider consistent with YCDC's policy on forced injection of psychotropic medication.  (Doc. 120 at 7-8.)  Acosta contends that the forced injection was required to avoid further harm to Plaintiff and correctional staff, and Plaintiff cannot demonstrate that Acosta deprived him of care, causing further injury.  (*Id.* at 8.)  Acosta also asserts that as an LPN, she could not independently assess Plaintiff, and she appropriately relied on Defendant James to determine the best course of action.  (*Id.*)

In his Response, Plaintiff contends Defendant Acosta injected him "without making

any first hand professional examination, evaluations, assessment, or other investigations of [Plaintiff's] medical records and history, or [his] personal prison/jail/institutional records or file."  (Doc. 154 at 7.)[7]

As discussed, Defendant Acosta conveyed Plaintiff's assault on staff and mental state to Defendant James and followed James's order to administer Haldol and Benadryl. It was not unreasonable for Acosta to rely on James's treatment decision, and Acosta had no authority to override James's decision or prescribe any other treatment.  On this record, no reasonable jury could conclude that Defendant Acosta was deliberately indifferent to Plaintiff's serious medical needs.  There are no genuine disputes of material fact regarding whether Defendant Acosta violated Plaintiff's Eighth Amendment rights.

Plaintiff also contends in his Response that he adequately stated a Fourteenth Amendment due process claim with respect to the forced injections.  (Doc. 154 at 8.)  In the Complaint, Plaintiff alleged that YCDC's policy of allowing non-medical staff to control medical decisions regarding pretrial detainees violated his Fourteenth Amendment rights.  (Doc. 17 at 9.)  Plaintiff further claimed that Defendants James, Acosta, and Vargas violated his Fourteenth Amendment rights when they prescribed forced injections of psychotropic drugs "without making any firsthand professional examinations" of Plaintiff, his medical records and history, or his prison and institutional records, and without a court order.  (*Id.*)  On screening, the Court observed that, despite facing new charges, Plaintiff was a convicted prisoner, and his claims must be analyzed under the Eighth Amendment rather than the Fourteenth Amendment.  (Doc. 19 at 3 n.1.)

Even if the Court construes the Complaint as asserting a due process claim, Defendant Acosta is entitled to summary judgment on such a claim.  The Supreme Court has recognized a substantive component of the Due Process Clause, which places "a

---

[7] Plaintiff also argues that he stated a viable First Amendment claim regarding the forcible injections in the Complaint.  (*Id.*)  On screening, the Court dismissed Plaintiff's First Amendment claim regarding the forced injections.  (Doc. 19.)  The Court will not address Plaintiff's First Amendment argument.

limitation on the State's power to act" that "was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)). "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir. Mo. Dep't. of Health*, 497 U.S. 261, 278 (1990).  However, *DeShaney* emphasized that "only the most egregious official conduct" qualifies as "abusive executive action" that violates the substantive component of the Due Process Clause. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) .  Official conduct meets this high standard only when the "executive abuse of power" is so outrageous that it "shocks the conscience," such as when a state official engages in "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849.  If there is no "affirmative abuse of power" by the state, then there is no violation of substantive due process. *Daniels v. Williams*, 474 U.S. 327, 330 (1986).

In *Washington v. Harper*, 494 U.S. 210 (1990), the Supreme Court recognized that a prisoner has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," *id.* at 221-22, and "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," *id.* at 229.  However, the extent of a prisoner's right to avoid the unwanted administration of antipsychotic drugs "must be defined in the context of the inmate's confinement." *Id.* at 222.  Applying the factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987),[8] the Supreme Court concluded that a policy allowing prisoners to be treated with antipsychotic drugs without their consent comported with constitutional requirements if the prisoner "(1) suffers from a 'mental disorder' and (2) is "gravely disabled" or poses a 'likelihood of serious harm' to himself, others, or their property." *Id.* at 215, 225. The Supreme Court observed that "there can be little doubt as to both the legitimacy and the importance of the governmental interest

_____

[8] The *Turner* test is discussed in detail below.

presented here." *Id.* at 225 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).  For "[t]here are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'" *Id.*  The Supreme Court also determined that the policy was a rational means of furthering the State's legitimate objectives because "[i]ts exclusive application [was] to inmates who are mentally ill and who, as a result of their illness, are gravely disabled or represent a significant danger to themselves or others." *Id.* at 226.

Here, there is ample evidence that Plaintiff presented a significant danger to others. Before Defendant Acosta administered the injections, Plaintiff had headbutted Officer Vasquez in the face, a toothbrush that had been sharpened to a point had fallen from his waistband, and a large pencil, which Plaintiff was not permitted to possess, was found in his sock.  Because of Plaintiff's agitated state, Defendants Acosta and Vargas could not perform a medical assessment to determine whether the restraints were properly applied. On this record, there are no genuine disputes of material fact regarding whether Defendant Acosta's conduct was intended to injure Plaintiff in some way unjustifiable by any government interest or whether her conduct "shocks the conscience." *Cnty. of Sacramento*, 523 U.S. at 846.  Accordingly, even if the Court construes the Complaint as asserting a substantive due process claim, Defendant Acosta is entitled to judgment as a matter of law with respect to that claim.

For the foregoing reasons, the Court will also grant Defendant Acosta's Motion for Summary Judgment.

### G.    Zero Item Status (Count Four)

In Count Four, Plaintiff alleges his placement on "zero item status" violated his Eighth Amendment rights.

### 1.    Conditions of Confinement Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement.  *Morgan v. Morgensen*, 465

F.3d 1041, 1045 (9th Cir. 2006) (first citing *Farmer*, 511 U.S. at 847); then citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). However, "the Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes*, 452 U.S. at 349. "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 348.

To prevail on an Eighth Amendment conditions-of-confinement claim, a plaintiff must meet a two-part test. First, the plaintiff must make an "objective" showing that the alleged deprivation is "sufficiently serious." *Farmer*, 511 U.S. at 834. Second, the plaintiff must make a "subjective" showing that the prison official acted with a "sufficiently culpable state of mind." *Id.*. The first element is satisfied when a prisoner is deprived of "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The second element is satisfied when a prisoner shows that prison officials acted with deliberate indifference to the prisoner's health or safety or conditions of confinement that violated the prisoner's constitutional rights. *Id.* at 302-03. To show deliberate indifference, the plaintiff must establish that the defendant knew of and disregarded an excessive risk to prisoner health or safety. *Farmer*, 511 U.S. at 837. To satisfy the knowledge component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Whether conditions of confinement rise to the level of a constitutional violation depends, in part, on the duration of a prisoner's exposure to those conditions. *See Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (citing *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978)). "The circumstances, nature, and duration of a deprivation of . . . necessities must be considered in determining whether a constitutional violation has occurred." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

1

2. **Individual Defendants**

2

a. **Defendant Wilmot**

3        There is no respondeat superior liability under § 1983, and therefore, a defendant's

4 position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights

5 does not impose liability. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Rather,

6 "there must be a showing of personal participation in the alleged rights deprivation." *Id.*

7        There is no evidence that Defendant Wilmot was personally involved in any of the

8 events described in Count Four. The Court will grant summary judgment in favor of

9 Defendant Wilmot as to Count Four.

10

b. **Other Individual Defendants**

11        Defendants Lieutenant Duarte, Guerrero, Oberosler, Gomez, and Milner each aver

12 that they never directed that Plaintiff be placed on "one for one" or "restrictive one for one"

13 status; made no decisions regarding Plaintiff's conditions of confinement during the

14 relevant timeframe; did not authorize any officers or other YCDC staff to place Plaintiff

15 on "one for one" status; and did not make any decision to restrict Plaintiff's ability to

16 communicate, including through phone calls, mail, emails, the tablet, or through visitation

17 with either his lawyer or his friends/family. (Doc. 128-4 at 205 ¶¶ 6-10, 209 ¶¶ 6-10,

18 228-29 ¶¶ 7-11, 266 ¶¶ 6-10, 52 ¶¶ 6-10.) Plaintiff does not provide evidence to rebut these

19 declarations. Accordingly, there is no evidence in the record that Defendants Lieutenant

20 Duarte, Guerrero, Oberosler, Gomez, and Milner were personally involved in placing

21 Plaintiff on a "one for one" or "restrictive one for one" status. . Thus, on this record, there

22 are no genuine disputes of material fact regarding whether Defendants Lieutenant Duarte,

23 Guerrero, Oberosler, Gomez, Milner violated Plaintiff's Eighth Amendment rights with

24 respect to his conditions of confinement. *See Williams*, 297 F.3d at 934. The Court will

25 grant summary judgment in favor of Defendants Duarte, Guerrero, Oberosler, Gomez, and

26 Milner as to Count Four.

27

28

### 3.   Cooper

#### a.   Constitutional Violation

Defendants have presented evidence that YCDC does not have a "zero item status," but at various points during his incarceration at YCDC, Plaintiff was placed on "restrictive one for one status."  Regardless of the accuracy of Plaintiff's description of a "zero item status," the Court must accept as true the allegations in the verified Complaint regarding the conditions Plaintiff experienced between July 8 and September 2020.

Defendants argue that Defendant Cooper's decision to place Plaintiff on restrictive one for one status did not violate the Eighth Amendment because "Plaintiff was never deprived of the items/privileges alleged in his Complaint but was provided them in a different form.  As such, these claimed deprivations were not sufficiently serious." (Doc. 127 at 10.)  The first issue the Court must address is whether, accepting as true the allegations in the verified Complaint, the conditions Plaintiff experienced violated the Eighth Amendment.

The parties present markedly different descriptions of the conditions Plaintiff experienced while he was on restrictive one for one status.  According to the verified Complaint, for approximately two months, Plaintiff was housed in a cell that was stripped of a mattress, linens, bedding, and all property including clothing; received a lower calorie diet consisting of "sack lunches"; and was locked down twenty-four hours per day, seven days per week.  (Doc. 17 at 9.)  Plaintiff allegedly suffered "severe hunger pains[,] particularly during the 13-hour period between dinner and breakfast where he was deprived of sleep[,] and suffered significant weight loss and constipation and irregular/irritable bowel movements, with blood in [his] stool." (*Id.*)  For almost two months he supposedly was forced to walk, sit, and lay down on the cold concrete floor without footwear or proper clothing; was constantly cold; and, consequently, was deprived of meaningful sleep.  (*Id.* at 18.)  Plaintiff alleges he was denied hygiene products and regular showers, and for over 120 days, he was not given any outdoor recreation or exercise.  (*Id.* at 18-19.)  Plaintiff claims to have suffered anxiety, lethargy, and muscle atrophy as a result.  (*Id.*)

Defendants presented documentary and testimonial evidence that contradicts Plaintiff's allegations. Specifically, Defendants presented evidence that Plaintiff always had a blanket and mattress at night, which were collected in the morning; he was never denied clothing and was permitted to have sandals, albeit not always inside his cell; he was permitted to shower every three days, like all F1 inmates, and had access to his toothbrush, toothpaste, a comb, liquid soap, and deodorant at all times; he was provided three sack meals a day for approximately three weeks from the end of June 2020 until mid-July 2020 because there was a safety concern with providing a food tray to Plaintiff; and the sack meals were created by a dietician to ensure he was still provided with meals that meet the necessary dietary requirements. (CDSOF ¶¶ 217-269.) Defendants also presented evidence that Plaintiff could request recreation time. In his Declaration, Defendant Cooper avers that he "recall[s] that Plaintiff regularly refused recreation time because he did not like the F1 recreation yard." (Doc. 128-2 at 16 ¶ 162.) According to Plaintiff's Inmate Activity Log, Plaintiff had regular recreation from May 9 through June 21, 2020. (Doc. 128-2 at 135-36.) However, there is no indication that he had any recreation between June 21, 2020 and September 30, 2020. (*Id.* at 136-39.) Defendants have not presented any evidence regarding whether Plaintiff suffered significant weight loss, constipation, irregular/irritable bowel movements, blood in his stool, anxiety, lethargy, muscle atrophy, or loss of sleep, or whether sleeping on concrete aggravated a shoulder injury while he was on restrictive one for one status.

Although Plaintiff alleges in the verified Complaint that the sack meals he received were calorically insufficient, he does not include supporting facts to refute Defendants' evidence that the meals were calorically sufficient. Likewise, Plaintiff alleges that he was denied shoes, but the evidence shows that although Plaintiff was not always allowed to have shoes in his cell, he was provided shoes when he left his cell. Plaintiff has not rebutted this evidence. In any event, not being permitted to have sandals in Plaintiff's cell does not offend the Eighth Amendment. Plaintiff's contention that he was denied hygiene products and "regular" showers is too vague to permit the Court to find that those conditions violated

his Eighth Amendment rights.  Similarly, Plaintiff alleges there was no clothing in his cell, and he was deprived of "proper" clothing, but Defendants have presented evidence that he was never denied clothing, and Plaintiff has not rebutted that evidence or presented evidence that he was denied "proper" clothing.

Plaintiff alleges that when he was placed on restrictive one for one status between November 8 to 22, 2021, he was left in his cell without a blanket or footwear and was forced to walk on an "ice cold floor" in bare feet and to "curl up into a ball, tucking [his] arms inside of shirt sleeves for warmth and to protect [himself] from extremely cold temperatures in his cell." (Doc. 17 at 18.)  The "Eighth Amendment guarantees adequate heating" but not necessarily a "comfortable" temperature.  *See Keenan*, 83 F.3d at 1091; *Wilson*, 501 U.S. at 304 (stating "low cell temperature at night combined with a failure to issue blankets" could constitute an Eighth Amendment violation).  "One measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses 'a substantial risk of serious harm.'" *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834). Exposure to freezing or near-freezing temperatures, coupled with other deprivations, may subject an inmate to a substantial risk of serious harm.

Plaintiff does not define "extremely cold temperatures" in the verified Complaint, but in any event, exposure to cold temperatures for two weeks, in the absence of other deprivations, does not amount to an Eighth Amendment violation.  *See Micenheimer v. Soto*, 2013 WL 5217467, at *5 (C.D. Cal. Sept. 16, 2013) ("Whether an inmate's exposure to cold temperatures constitutes an Eighth Amendment violation depends on the severity of the cold, the duration of the prisoner's exposure, the presence of an alternative means to warmth (i.e., a blanket or jacket), the efficacy of that alternative, and the presence of 'other uncomfortable conditions[.]'") (quoting *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997); *Cf. Smith v. Mendoza*, 2022 WL 523328, at * 4 (N.D. Cal. Feb 22, 2022) (exposure to temperatures below 40 degrees for fifteen months could violate the Eighth Amendment); *Fields v. Junious*, 2012 WL 2116351, at *7 (E.D. Cal. June 11, 2012), *report and recommendation adopted*, 2012 WL 3201689 (E.D. Cal. Aug. 3, 2012) (in-cell exposure

to "ice cold air" for over six months could "rise to the level of a serious harm within the meaning of the Eighth Amendment"). In addition, even if Plaintiff's allegations are "sufficiently serious" to satisfy *Farmer's* objective requirement, they do not establish that prison officials acted with deliberate indifference toward Plaintiff's health. *Wilson*, 501 U.S. at 299, 302-03. Without such evidence, the verified Complaint does not amount to an Eighth Amendment violation.

With respect to recreation, deprivation of outdoor exercise to prisoners incarcerated for long periods violates the Eighth Amendment rights of prisoners "confined to continuous and long-term segregation." *Keenan*, 83 F.3d at 1089.   As noted, Defendant Cooper recalled that Plaintiff regularly refused recreation time because he did not like the F1 recreation yard.   According to Plaintiff's Inmate Activity Log, Plaintiff had regular recreation from May 9 through June 21, 2020 but there is no indication that he had any recreation between June 21, 2020 and September 30, 2020.  The Inmate Activity Log does not state whether recreation was offered and refused.  Accepting as true the allegations in the verified Complaint, as the Court must, a denial of outdoor exercise 120 days is a sufficiently serious deprivation to support an Eighth Amendment claim.  *See Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (a denial of outdoor exercise for 6 weeks is a sufficiently serious deprivation to support an Eighth Amendment claim).  Even if there were security concerns with allowing Plaintiff outdoor recreation with the general population or even other F1 or F2 inmates, that does not explain "why other exercise arrangements were not made." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979); *see also Lopez*, 203 F.3d at 1133 (holding that even if denying prisoner access to the general recreation yard was reasonable, "it does not explain why [the prisoner] was not given some other opportunity for outdoor exercise").  Defendants' cited cases are inapposite because they predate *Lopez* and involve shorter deprivations of outdoor recreation.  *See May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (finding twenty-one days without outdoor recreation insufficient to establish Eighth Amendment violation); *Norwood v. Woodford*, 661 F. Supp. 2d 1148, 1155 (S.D. Cal. 2009) (finding thirty-nine days without recreation,

where such restrictions were due to assaults on staff, not an Eighth Amendment violation).

Accordingly, there are genuine disputes of material fact regarding whether the conditions Plaintiff experienced while on restrictive one for one status, as it pertains to outdoor recreation or exercise, violated his Eighth Amendment rights. The Inmate Activity Log also supports an inference that Defendant Cooper knew about the confinement Plaintiff experienced while on restrictive one for one status. On this record, a reasonable jury could conclude that Defendant Cooper violated Plaintiff's Eighth Amendment rights with respect to outdoor recreation or exercise.

### b.    Qualified Immunity

Defendants argue they are entitled to qualified immunity with respect to all of Plaintiff's claims because "Plaintiff cannot establish that an objective officer would believe their actions (or lack thereof) during the above-referenced incidents was unlawful." (Doc. 127 at 43.) Defendants do not present any specific argument that they are entitled to qualified immunity with respect to any particular claim.

Under the doctrine of qualified immunity, state officials are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 584 U.S. at 104 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). At summary judgment, an officer may be denied qualified immunity "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood

[his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

Although there does not need to be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 584 U.S. at 104 (quoting *White*, 580 U.S. at 79). The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity." *Wesby*, 583 U.S. at 66 n.8. But the Supreme Court has assumed, without deciding, that controlling circuit precedent can constitute clearly established law. *See, e.g.*, *City and Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 614 (2015); *Carroll v. Carman*, 574 U.S. 13 (2014); *Reichle v. Howards*, 566 U.S. 658, 665-666 (2012) (concluding that even if controlling circuit authority could be a dispositive source of clearly established law, the Tenth Circuit's cases did not satisfy the "clearly established" standard).

To the extent Defendants seek to assert qualified immunity on the second prong—that Defendant Cooper did not violate any clearly established rights of which a reasonable officer would have known—Defendants fail to identify the right at issue. Plaintiff has the burden to show that the right was clearly established at the time; however, Defendants did not expressly argue this right was not clearly established.

Considering the specific context of the case, the right at issue here is the right of a prisoner to regular outdoor recreation or exercise. Whether Defendant Cooper is entitled to qualified immunity turns on whether outdoor recreation was available to Plaintiff while he was on restrictive one for one status. Because there is a genuine dispute regarding this issue, summary judgment is not appropriate. *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.").

### 4. Yuma County

To bring a constitutional claim under § 1983 against a municipality, like Yuma

County, Plaintiff cannot rely on respondeat superior liability. *Monell*, 436 U.S. at 691. Rather, to prevail on a claim against Yuma County, he must show (1) a depravation of a constitutional right; (2) Yuma County had a policy or custom; (3) the policy or custom amounted to deliberate indifference to his constitutional right; and (4) the policy or custom was the "moving force behind the constitutional violation." *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (quoting *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996)). The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1075 (9th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "It is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury." *Id.* at 1076. Rather, "[a] plaintiff must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of the jail's inhabitants.'" *Id.* (quoting *City of Canton*, 489 U.S. at 392).

If the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

The Court has determined there are genuine disputes of material fact regarding whether Plaintiff's Eighth Amendment rights were violated because he was denied outdoor recreation or exercise for 120 days while he was on restrictive one for one status. The issue is whether there is a "direct causal link" between YCDC's policy and the violation of Plaintiff's Eighth Amendment rights. Defendants have presented evidence regarding YCDC's recreation policy for F1 inmates and inmates on restrictive one for one status. In his Declaration, Defendant Cooper avers that "F1 inmates are offered recreation at set

times, unless specific disciplinary sanctions require otherwise," and an inmate must request recreation during the scheduled time. (Doc. 128-2 at 7 ¶ 40.) Plaintiff's allegations, taken as true, demonstrate a *violation* of YCDC policy, not a "direct causal link" between the policy and the injury he suffered. Plaintiff has not presented evidence that YCDC's recreation policy for F1 inmates and inmates on restrictive one for one status "was adhered to with 'deliberate indifference'" to his Eighth Amendment rights. *Castro*, 833 F.3d at 1076.

Plaintiff also has not presented any evidence that violations of the recreation policy for F1 inmates and inmates on restrictive one for one status was so "persistent and widespread" that it constituted a "permanent and well settled practice." *Monell*, 436 U.S. at 691. Yuma County cannot be held liable for one instance of violation of YCDC's recreation policy.

On this record, there are no genuine disputes of material fact regarding whether Yuma County's restrictive one for one policy, as it pertains to outdoor recreation of exercise, amounted to deliberate indifference to Plaintiff's constitutional right and whether the policy or custom was the moving force behind the constitutional violation. The Court will therefore grant Defendants' Motion for Summary Judgment in favor of Yuma County as to Count Four.

### H.    First Amendment (Count Five)

In Count Five, Plaintiff alleges the acts described in Count Four violated his First Amendment rights. (Doc. 17 at 23.)

#### 1.    Legal Standard

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner," *Pell v. Procunier*, 417 U.S. 817, 822 (1974), but inmates' First Amendment rights are "necessarily limited by the fact of incarceration and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *See McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987). Prisoners enjoy a First Amendment right to send and receive mail, *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir.

1995), but they "have no constitutional right while incarcerated to contact visits," *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002); *Barnett v. Centoni*, 31 F.3d 813, 817 (9th Cir. 1994) (holding that prisoners do not have a constitutional right to contact visitation privileges).

A regulation that impinges on a prisoner's First Amendment rights is valid if it "is reasonably related to legitimate penological interests." *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (quoting *Turner*, 482 U.S. at 89).   To determine whether a regulation or restriction is reasonably related to legitimate penological interests, courts apply the test established in *Turner*, which considers four factors: (1) whether there is a valid, rational connection between the restriction and the legitimate governmental interest it is designed to protect; (2) whether the prisoner has alternative means of exercising the right at issue; (3) the impact any accommodation would have on guards, other inmates, and allocation of prison resources; and (4) whether there are "ready alternatives" for furthering the government interest, which would suggest that the restriction is an exaggerated response to the prison's concern. *Turner*, 482 U.S. at 89-90.  Courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Bank*, 548 U.S. 521, 522 (2006) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).  The Supreme Court in *Turner* recognized that "[p]rison administration is . . . a task that has been committed to the responsibility of [the legislative and executive branches], and separation of powers concerns counsel a policy of judicial restraint."  482 U.S. at 85.  "Where a state penal system is involved, federal courts have . . . an additional reason to accord deference to the appropriate prison authorities." *Id.*  In the Supreme Court's view, "such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* (quoting *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 128 (1977)).

### 2.   Analysis

#### a.   Individual Defendants

As discussed above with respect to Count Four, there is no evidence that Defendants

1    Wilmot, Lieutenant Duarte, Guerrero, Oberosler, Gomez, and Milner were personally

2    involved in the decision to place Plaintiff on restrictive one for one status. *See Williams*,

3    297 F.3d at 934. Accordingly, there are no genuine disputes of material fact regarding

4    whether Defendants Wilmot, A. Duarte, Guerrero, Oberosler, Gomez, and Milner violated

5    Plaintiff's First Amendment rights.

6                          **b.      Yuma County and Cooper**

7             To prevail on his First Amendment claim against Yuma County, Plaintiff must show

8    that his placement on restrictive one for one status violated his First Amendment rights.

9    Plaintiff challenges his restrictions on visitations, telephone calls and emails, writing

10   material and outgoing mail, and incoming mail to do so. As noted, the parties present

11   different descriptions of the conditions to which Plaintiff was subjected while he was on

12   restrictive one for one status.

13                          **(1)      Visitation**

14            Plaintiff did not have a First Amendment right to visitation. *See Gerber*, 291 F.3d

15   at 621; *Barnett*, 31 F.3d at 817. Moreover, Defendants have presented evidence that

16   Plaintiff was only completely denied visitation when he was also subjected to loss of

17   privileges as a disciplinary sanction. Plaintiff has not rebutted Defendants' evidence. The

18   restriction on visitation did not violate Plaintiff's First Amendment rights.

19                          **(2)      Telephone Calls and Emails**

20            In the verified Complaint, Plaintiff alleges that while he was on "zero item status"

21   he was denied telephone access. Defendants have presented evidence that between June

22   30 and September 30, 2020, Plaintiff had 501 telephone calls and sent and received 32

23   emails. (Doc. 128-2 at 10-15 ¶¶ 60-153, 173-74, 176-96.) Plaintiff does not provide

24   evidence to rebut Defendants' evidence that he had telephone and email access while he

25   was on restrictive one for one status. Although there is a dispute of fact regarding whether

26   Plaintiff had telephone access while he was on restrictive one for one status, on this record,

27   no reasonable jury could conclude that Plaintiff was completely denied telephone access

28   between June and September 2020. *See Fresno Motors LLC v. Mercedes Benz USA, LLC*,

771 F.3d 1119, 1125 (9th Cir. 2014) (stating "a dispute is 'genuine' only if a reasonably trier of fact could resolve the issue in the non-movant's favor").

### (3)    Writing Materials and Outgoing Mail

Defendants have presented evidence that Plaintiff had access to writing materials, and even if he was at times restricted from having a pencil in his possession due to his behavior, he could have asked officers to assist him with writing a letter, completing a grievance, or completing any other request.  (CDSOF ¶ 262.)  During his deposition, Plaintiff testified that he could not send any personal mail because he did not have "anything to write with or to send mail."  (Doc. 128-4 at 135:22-25.)  Accepting as true that Plaintiff was not permitted to have paper or writing instruments in his cell and could not send any mail, the restriction did not violate Plaintiff's First Amendment rights.  The inability to send mail implicates Plaintiff's First Amendment right to communicate with persons outside prison walls.  *See Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002).  Sending letters is a "*means* of exercising that right."  *Id.*  Accordingly, the Court must determine whether the restriction on sending letters was reasonably related to legitimate penological interests.  *Turner*, 482 U.S. at 89.

First, the Court must determine whether the governmental objective underlying the restriction is (1) legitimate and (2) neutral, and (3) whether the policy is rationally related to that objective.  *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). Defendants have presented evidence that F1 inmates like Plaintiff, particularly those on restrictive one for one status, have a history of assaultive behaviors towards staff or other inmates and using property to manufacture weapons or other contraband.  "Maintaining security in a jail is inarguably a legitimate government interest."  *Crime Just. & Am., Inc. v. Honea*, 876 F.3d 966, 975 (9th Cir. 2017); *see also Thornburgh*, 490 U.S. at 415 ("[P]rotecting prison security . . . is central to all other corrections goals.").  The restrictive one for one status was rationally related to the legitimate government interest in maintaining safety and security.  The first *Turner* factor is satisfied.

The second *Turner* factor considers "whether there are alternative means of

exercising the right that remain open to prison inmates." 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004). When analyzing the second *Turner* factor, the Court must view the right in question "sensibly and expansively." *Thornburgh*, 490 U.S. at 417 (citation omitted). Plaintiff had alternative means of exercising his right to communicate with persons outside the prison walls because the evidence demonstrates he could make and receive phone calls and send and receive email. The second *Turner* factor is satisfied.

Third, the Court must consider the impact on the prison if inmates with histories of assaultive and disruptive behavior were permitted to have more than one item at a time in their cells. *See Turner*, 482 U.S. at 90. "If accommodations for a constitutional right would cause significant changes within the prison environment, the courts should give deference to the prison officials who are responsible for safe, effective, and efficient administration of the prison system." *Bahrampour*, 356 F.3d at 975. Allowing dangerous and disruptive prisoners to possess excess property, particularly property that can be used as a weapon or used to manufacture weapons, would cause significant challenges within the facility. The third *Turner* factor is satisfied.

Finally, the Court examines whether the policy at issue is an exaggerated response to the facility's concerns. *Turner*, 482 U.S. at 90. On this prong, Plaintiff bears the burden of showing that there are obvious, easy alternatives to the regulation. *Mauro v. Arpaio*, 188 F.3d 1054, 1062 (9th Cir. 1999). If Plaintiff can identify an alternative that fully accommodates the right at a de minimis cost to valid penological goals, the policy is an exaggerated response. *Turner*, 482 U.S. at 90-91. "If there are no obvious alternatives, and if the inmate only presents solutions that will negatively impact valid penological interests, then courts will view the absence of ready alternatives as evidence of a reasonable regulation." *Bahrampour*, 356 F.3d at 976. Plaintiff has identified no obvious, easy alternatives to the one for one restriction that would indicate that the restriction was an

exaggerated response.  The fourth *Turner* factor is satisfied.

### (4)    Incoming Mail

With respect to Plaintiff's incoming mail, Defendants have presented evidence that his personal mail was never completely withheld while he was on restrictive one for one status.  Plaintiff could have one piece of mail in his cell at a time and was not permitted to possess any other item until that piece of mail was returned.  He also testified that he received his incoming mail "eventually," but it was delayed.  (Doc. 128-4 at 135-36.)

The Court must determine whether only allowing Plaintiff to have one item of mail in his cell at a time violated his First Amendment rights.  Jails and prisons may regulate the processing of inmate mail, so long as those regulations further an important or substantial government interest other than the suppression of expression.  *See Procunier v. Martinez*, 416 U.S. 396, 411-12 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. at 412-14.

The Court has already determined that the one-item restriction was rationally related to a legitimate governmental interest.  Plaintiff's mail was not delivered to him all at once because of his behavior, not as a means of suppression of expression.  The restriction on Plaintiff's incoming mail did not violate the First Amendment.

On this record, no reasonable jury could conclude that the conditions while Plaintiff was on restrictive one for one status violated his First Amendment rights.  Accordingly, there are no genuine disputes of material fact regarding whether Defendants violated Plaintiff's First Amendment rights.  The Court will grant Defendants' Motion for Summary Judgment as to Count Five.

### I.    Sixth Amendment (Count Six)

In Count Six, Plaintiff alleges that his placement on "zero item status" violated his Sixth Amendment rights.

### 1.    Legal Standard

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. Const.

amend. VI; *see also Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963) (holding that Sixth Amendment right to counsel extends to state court proceedings through the Fourteenth Amendment).   "When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584-85 (9th Cir. 2004).  "A criminal defendant's ability to communicate candidly and confidentially with his lawyer is essential to his defense." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014).

### 2.    Analysis

#### a.    Individual Defendants

For the reasons discussed above with respect to the First Amendment claim, there are no genuine disputes of material fact regarding whether Defendants Wilmot, Lieutenant Duarte, Guerrero, Oberosler, Gomez, and Milner violated Plaintiff's Sixth Amendment rights.

#### b.    Yuma County and Cooper

The parties dispute whether Plaintiff had access to his legal counsel in his criminal proceeding while he was on restrictive one for one status.  According to the verified Complaint, between June and September 2020, Plaintiff had no access to legal visits or phone calls.  Defendants have presented evidence that Plaintiff had one in-person legal visit and two video legal visits between July 28 and September 28, 2020.  (Doc. 128-2 at 14 ¶¶ 154-56, 198, 202.) Plaintiff does not provide evidence to rebut Defendants' specific evidence that he had legal visits and phone calls while he was on restrictive one for one status.  As such, Plaintiff's conclusory assertion cannot overcome the evidence that he was allowed legal visits and phone calls during the relevant time. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007).  On this record, no reasonable jury could conclude

that Plaintiff had no means of communication with his legal counsel while he was on restrictive one for one status between June and September 2020.

With respect to legal mail, there is a dispute of fact, albeit not a genuine one, regarding Plaintiff's access to legal mail while he was on restrictive one for one status. According to the verified Complaint, for forty-five days, his legal mail was completely withheld.  At his deposition, Plaintiff testified that when he "came off of zero-item status, they handed [him] . . . stacks and stacks of manilla envelopes and different mail."  (Pl.'s Doc. 128-4 at 133.)  Plaintiff also testified that he eventually received all his legal mail, but he received some of it a year later.  (*Id.* at 134.)  He testified that because of the delay, in both his criminal and civil cases, he "missed court deadlines, and [he] believe[d] there was some discovery issues," but he "[could not] recall off the top of [his] head."  (*Id.*)  Plaintiff testified that the delay "didn't defeat any of [his] cases" and he was not convicted "as a result of those specific instances."  (*Id.* at 135.)  Defendants have presented evidence that Plaintiff's legal mail was never entirely withheld while he was on restrictive one for one status.

Even if Plaintiff's legal mail was entirely withheld for forty-five days, Plaintiff has not presented sufficient evidence that he suffered any injury with respect to his criminal proceeding because of the delay.  Plaintiff could not identify any specific deadline he missed in his criminal case because his legal mail was withheld, and he was not convicted in the criminal case.  There is no evidence that the withholding of his legal mail interfered with his ability to effectively communicate with his attorney or assist with his own defense. A showing of an actual injury is necessary to establish a violation of the Sixth Amendment right to counsel; Plaintiff has failed to make such a showing.  *See Maine v. Moulton*, 474 U.S. 159, 170 (1985).  On this record, there is no genuine dispute of material fact regarding whether withholding Plaintiff's legal mail while he was on restrictive one for one status violated his Sixth Amendment rights.

To the extent that Plaintiff was representing himself in his criminal proceedings, he had no Sixth Amendment right to communicate confidentially with his attorney.  "[T]he

Sixth Amendment demands that a pro se defendant who is incarcerated be afforded reasonable access to 'law books, witnesses, or other tools to prepare a defense.'" *United States v. Sarno*, 73 F.3d 1470, 1491 (9th Cir. 1995) (quoting *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985)).  This right of access is not unlimited, however, and must be "balanced against the legitimate security needs or resource constraints of the prison." *Sarno*, 73 F.3d at 1491.  "[A] criminal defendant who exercises his right to reject counsel necessarily relinquishes many of the benefits associated with representation by counsel." *United States v. Wilson*, 690 F.2d 1267, 1271 (9th Cir. 1982).  Plaintiff has not alleged, and there is no evidence in the record to support, that he was denied reasonable access to resources and tools required to prepare a defense while he was on restrictive one for one status.  And Plaintiff suffered no injury because the charges in the criminal case were dismissed.

On this record, there are no genuine disputes of material fact regarding whether Plaintiff's placement on restrictive one for one status violated his Sixth Amendment rights.

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Count Five.

## IV. *Williams #2 (CV-22-01118)*

### A. Background

In *Williams #2*, the sole remaining claim is Plaintiff's Fourth Amendment claim in Count Four regarding YCDC's policy of subjecting prisoners in the special management units ("SMUs") to, what Plaintiff claims, are unreasonable and excessive body and cavity searches.  (Doc. 6 at 20.)  On screening, the Court determined that Plaintiff stated a Fourth Amendment claim against Yuma County and Defendants Sheriff Wilmot, Milner, Cooper, Lieutenant Duarte, Gomez, and Guerrero, in their individual and official capacities. (Doc. 14 at 10.)

### B. Plaintiff's Allegations

Defendant Yuma County has a custom or practice of punishing pretrial detainees by arbitrarily subjecting select prisoners to "excessive, unnecessary, and unreasonable fully

unclothe[d] body and cavity searches or 'strip searches' as a means of punishment, harassment, embarrassment, and psychological abuse. (Doc. 6 at 20.) Inmates in the SMUs must submit to the body and cavity searches before "going and coming from the shower, the medical unit, visitation . . . , court, any type of recreation or other programs, or before coming out of their cells for any reason," and, as a result, are sometimes subjected to searches multiple times per day. (*Id.*) Inmates who refuse to comply are "denied whatever the cause [for] the movement including medical treatment, legal visits, etc." (*Id.*) No other inmates in the jail are subjected to this treatment "in spite of the fact that the SMU units are isolation units where [inmates] have no physical contact with each other or any other [inmates] in the jail and all movement requires full restraints . . . and the presence of multiple officers and SMU [inmates] are never left unattended." (*Id.*)

### C.   Defendants' Facts

As a security and safety measure, each time an F1 inmate leaves his cell, and upon returning to his cell, officers conduct an "unclothed body search" of the inmate. (CDSOF ¶ 273.) The decision to conduct these searches on all F1 inmates was made as part of adopting procedures due to F1 inmates' propensity for violence and manipulation of items in or around their housing units. (*Id.* ¶ 274.) Although F1 inmates were restrained during all movements and had multiple officers present for these movements, that did not prevent inmates from finding ways to obtain contraband items and/or items that were then manufactured into a weapon. (*Id.* ¶ 275.)

YCSO Policy 822.1–822.5, titled "Strip Search," sets forth the procedure by which YCSO personnel, including officers at YCDC, are to follow regarding a strip search of an inmate. (*Id.* ¶ 242.) The policy states that a strip search is a necessary procedure for the maintenance of security. (*Id.*) A strip search is defined as the thorough visual examination of an inmate's body, including body cavities, and physical examination of an inmate's clothing by a detention officer to detect the possession of contraband. (*Id.* ¶ 243.)

When conducting a strip search, the officer will instruct the inmate to disrobe, followed by an explanation of the necessity of the search and how the search will proceed.

1    (*Id.* ¶ 244.)  Under no circumstances is an officer permitted to conduct or witness a strip

2    search of an inmate of the opposite sex.  (*Id.* ¶ 245.)

3         All inmates at YCDC are searched when they arrive at intake if they were arrested

4    on federal charges or state felony charges; upon returning from an outside court appearance

5    before returning to their housing unit; upon returning from the medical unit before

6    returning to their housing unit; and after contact visitation prior to returning to their housing

7    unit.  (*Id.* ¶ 246.)  Additionally, as noted, inmates in F1 are strip searched any time they

8    leave or return to their cell.  (*Id.* ¶ 247.)  Strip searches of F1 inmates occur in their cells,

9    in designated strip search areas (i.e. there is one in the shower area), or private rooms

10   designated for strip searches.  (*Id.* ¶ 248.)  The strip searches are never completed in an

11   area where cameras or other staff or inmates can witness the strip search.  (*Id.*)

12        **D.**    **Official Capacity Claims**

13         Plaintiff's official-capacity claims against the individual Defendants are duplicative

14   of the claim against Yuma County.  The Court will therefore dismiss the official-capacity

15   claims.

16        **E.**    **Fourth Amendment Legal Standard**

17         Although "convicted prisoners do not forfeit all constitutional protections by reason

18   of their conviction and confinement in prison," *Bell*, 441 U.S. at 545, "[t]he limitations on

19   the exercise of constitutional rights arise both from the fact of incarceration and from valid

20   penological objectives—including deterrence of crime, rehabilitation of prisoners, and

21   institutional security," *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  The

22   Supreme Court has recognized that "[a] right of privacy in traditional Fourth Amendment

23   terms is fundamentally incompatible with the close and continual surveillance of inmates

24   and their cells required to ensure institutional security and internal order."  *Palmer*, 468

25   U.S. at 527-28.

26         Nevertheless, prison searches must be reasonable.  *Michenfelder v. Sumner*, 860

27   F.2d 328, 332 (9th Cir. 1988).  "[T]he reasonableness of a particular search is determined

28   by reference to the prison context."  *Id.*  The Supreme Court in *Bell* stated, "[t]he test of

1   reasonableness under the Fourth Amendment is not capable of precise definition or

2   mechanical application.  In each case it requires a balancing of the need for the particular

3   search against the invasion of personal rights that the search entails." 441 U.S. at 559.  The

4   Court must consider "the scope of the particular intrusion, the manner in which it is

5   conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

### F.    Analysis

#### 1.    Individual Defendants

8       Defendants presented evidence that Defendants Wilmot, A. Duarte, Guerrero,

9   Milner, Gomez, and Cooper never strip-searched Plaintiff while he was incarcerated at

10   YCDC.  Plaintiff does not provide evidence to rebut Defendants' evidence.  On this record,

11   there are no genuine disputes of material fact regarding whether Defendants Lieutenant

12   Duarte, Guerrero, Milner, and Gomez violated Plaintiff's Fourth Amendment rights.   The

13   Court will grant summary judgment in favor of Defendants Wilmot, A. Duarte, Guerrero,

14   Milner, Gomez, and Cooper.

#### 2.    Yuma County

16       Plaintiff challenges YCDC's strip search policy with respect to F1 inmates.  As

17   noted, "when a prison regulation impinges on inmates' constitutional rights, the regulation

18   is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at

19   90. The Court must consider: (1) the existence of a valid, rational connection between the

20   prison regulation and the legitimate governmental interest put forward to justify it; (2) the

21   existence of alternative means of exercising the right that remain open to inmates; (3) the

22   impact that accommodation of the asserted constitutional right will have on officers and

23   other inmates, and on the allocation of prison resources generally; and (4) the absence of

24   ready alternatives as evidence of the reasonableness of the regulation.  *Id.*  at 89-90.

25   However, "[n]ot all four factors will be relevant to each case.  For example, the second

26   *Turner* factor—availability of other avenues for exercising the right infringed upon—is

27   much more meaningful in the [F]irst [A]mendment context than the [F]ourth or [E]ighth,

28   where the right is to be free from a particular wrong." *Michenfelder*, 860 F.2d at 331 n1.

1    Here, the evidence demonstrates that strip searches of F1 inmates are visual only

2    and do not involve touching.  *See id.* at 332; *Rickman v. Avaniti*, 854 F.2d 327, 328 (9th

3    Cir. 1988).  F1 inmates are searched frequently—every time they leave or return to their

4    cells.  In *Michenfelder*, the Ninth Circuit recognized that prisoners were strip searched

5    frequently, even when traveling only within the unit while under escort and in chains at all

6    times but reasoned that "so long as a prisoner is presented with the opportunity to obtain

7    contraband or a weapon while outside of his cell, a visual strip search has a legitimate

8    penological purpose."  860 F.2d at 332-33; *see also id.* at 332 ("Elevated security

9    precautions are justified for prisoners placed in maximum security settings usually because

10   of a history of maladaptive behavior within prison."); *Rickman*, 854 F.2d at 328

11   (concluding that maintaining the high security required of the administrative segregation

12   unit was "suitable justification" for initiating a strip search policy).  Controlling contraband

13   within a prison is a legitimate penological interest, and Defendants have presented evidence

14   that even with additional security precautions, F1 inmates nevertheless "find[] ways to

15   obtain contraband items and/or items that are then manufactured into a weapon."  (CDSOF

16   ¶ 275.)  YCDC's strip search policy with respect to F1 inmates is reasonably related to

17   YCDC's interest in maintaining institutional safety and security.  *See Bell*, 441 U.S. at

18   550-51; *Nunez v. Duncan*, 591 F.3d 1217, 1228 (9th Cir. 2010).  And, under YCDC's

19   policy, strip searches of F1 inmates occur in their cells, in designated strip search areas, or

20   in private rooms, and are never completed in an area where cameras or other staff or

21   inmates can witness the strip search.  *See Rickman*, 854 F.2d at 328.  As noted, the Court

22   must give "substantial deference to the professional judgment of prison administrators."

23   *Beard*, 548 U.S. at 528 (quoting *Overton*, 539 U.S. at 132).

24        On this record, there are no genuine disputes of material fact regarding whether

25   YCDC's strip search policy violated Plaintiff's Fourth Amendment rights.  The Court will

26   grant summary judgment in favor of Yuma County as to Count Four.

27

28

**V.**     *Williams #3 (CV-22-01120)*

    **A.**     **Background**

In *Williams #3*, Plaintiff asserts an Eighth Amendment claim regarding his dental care and First Amendment claims regarding his mail.  (Doc. 6.)   As relevant here, on screening, the Court determined that Plaintiff stated Eighth Amendment medical care claims in Count Four against Defendants Yuma County and Vargas.  (Doc. 15 at 10.)  The Court also determined that Plaintiff stated a First Amendment claim against Defendant Rangel in Count Six for confiscating Plaintiff's mail without a legitimate penological purpose and against Defendants Yuma County, Wilmot, Milner, Cooper, Lieutenant Duarte, Gomez, Guerrero, and Oberosler in Count Seven for failing to implement a mail review or appeal process.  (*Id.* at 10-11.)

    **B.**     **Eighth Amendment (Count Four)**

        **1.**     **Plaintiff's Allegations**

In Count Four, Plaintiff alleges he was required to use an "all plastic finger toothbrush." (Doc. 6 at 15.)  After 15 months of using the toothbrush, he experienced pain and bleeding gums every time he brushed his teeth. Plaintiff submitted a medical request complaining of continual pain and bleeding in his gums, cavities, and pain in his upper left teeth, and requesting dental treatment.  (*Id.*)  Defendant Vargas responded to the request, stating that "the only dental services provided by the jail [were] 'teeth pullings,'" and asked Plaintiff if he wanted his teeth pulled.  (*Id.*)  Plaintiff said, "not if they don't have to be." (*Id.*) "[N]o medical or dental assistance was ever provided."  (*Id.*)  The lack of dental care caused Plaintiff pain and "may very well result in [him] having to get a tooth or teeth pulled." (*Id.* at 16.)

        **2.**     **Defendants' Facts**

YCDC Policy Number 817.1-817.5, titled "Medical Services-Dental," ("Dental Policy") was the dental policy that was in effect at the relevant time. (CDSOF ¶ 177.)  The policy states that the Yuma County Sheriff's Office Detention Center provides "prisoners with emergency dental care and other dental treatment as deemed necessary by the Medical

Staff or Dentist." (Doc. 128-3 at 219.) "Emergency dental care is available for prisoners experiencing acute dental problems, i.e., severe pain, infection, bleeding gums, or broken dental prosthesis necessary for eating." (*Id.*) "If the Medical Staff determines that emergency dental services are needed, the Medical Staff shall make the necessary arrangements for the prisoner to be seen by a dentist within 72 hours." (*Id.*) "A prisoner requesting routine dental care shall be provided with a Prisoner Medical Request Form and shall be instructed regarding completion of the form." (*Id.*)

On September 26, 2021, Plaintiff submitted a Medical Request Form requesting to be seen by a dentist. (*Id.* at 224.) Defendant Vargas completed a Medical Sick Call appointment with Plaintiff at his cell in F1-SMU housing unit on October 6, 2021. (CDSOF ¶ 179.) Plaintiff complained of upper right-side tooth pain to tooth #12. (Doc. 128-3 at 224.) Defendant Vargas examined tooth #12 and did not observe redness, swelling, or drainage to the gum or surrounding area. (*Id.*) She also did not observe any cracks in tooth #12 or the surrounding teeth and saw no signs or symptoms of infection in the area. (*Id.*) Defendant Vargas determined the tooth did not need to be pulled and no further action was needed. (*Id.*) Defendant Vargas told Plaintiff that if the pain persisted to submit a medical request. (CDSOF ¶ 184.) Plaintiff agreed to do so if necessary. (*Id.*) Defendant Vargas also told Plaintiff he could be seen for tooth extraction if that is what he wanted, but he declined, indicating he would wait to see if the pain persisted. (*Id.* ¶ 185.)

Plaintiff did not follow up with Defendant Vargas about tooth pain and did not request any further dental treatment during his incarceration at YCDC. (*Id.* ¶¶ 189-90.)

### 3.    Legal Standard

As noted, to prevail on an Eighth Amendment medical claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett*, 439 F.3d at 1096 (9th Cir. 2006) (quoting *Estelle*, 429 U.S. at 104). An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett*,

296 F.3d at 744, or when they fail to respond to a prisoner's pain or possible medical need, *Jett*, 439 F.3d at 1096.  And even if deliberate indifference is shown, to support an Eighth Amendment claim, a prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096.  The Ninth Circuit has recognized that dental care is an important component of a prisoner's medical needs. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

### 4.    Defendant Vargas

Even assuming Plaintiff had a serious dental need, there is no genuine dispute of material fact regarding whether Defendant Vargas was deliberately indifferent to his dental need.  Plaintiff complained of pain in a specific tooth, which Defendant Vargas examined and found no emergent issue.  Plaintiff agreed to wait to see if the pain subsided and never submitted another request regarding his pain.  On this record, no reasonable jury could conclude that Defendant Vargas was aware of and disregarded a substantial risk of serious harm to Plaintiff.  The Court will grant summary judgment in favor of Defendant Vargas as to Count Four.

### 5.    Yuma County

Plaintiff's claim against Yuma County fails because he has not shown that he suffered a constitutional violation.  *See Mabe*, 237 F.3d at 1110-11.  The Court will therefore grant summary judgment in favor of Yuma County as to Count Four.

### C.    First Amendment (Counts Six and Seven)

### 1.    Plaintiff's Allegations

On August 5, 2021, 100 non-nude photographs from CNA Entertainment were delivered to the jail for Plaintiff; on August 7, 2021, Plaintiff received an unauthorized property receipt, signed by Defendant Rangel, stating only that "64 pictures with sexually offensive material" were withheld, without providing any further description or explanation. (Doc. 1 at 19.)

On September 23, 2021, 26 non-nude photograph catalogs and 50 non-nude photographs from CNA Entertainment were received at the jail for Plaintiff; on September 25, 2021, Plaintiff received two unauthorized property receipts signed by Defendant

Rangel pertaining to 26 catalogs and 7 photographs that were withheld as "sexually offensive material." (*Id.*)

YCDC did not have a policy or procedure for appeals or second level reviews of seized publications and mail. (*Id.* at 21.)

### 2. Defendants' Facts

It is YCDC's policy to prohibit sexually explicit material from entering the facility. (CDSOF ¶ 134.) Specifically, images that show the anus, nipple, vagina, penis, or depict individuals engaged in sexual acts, are considered sexually explicit and are prohibited. (*Id.*) YCDC refers to this material as "sexually explicit," "sexually offensive," and "sexually orientated." (*Id.*) These terms are used interchangeably to describe material that contains images of the actions/body parts described above. (*Id.*) Such material is prohibited to reduce sexual harassment, prevent a hostile environment, and ensure rehabilitation of the inmate population. (*Id.* ¶ 135.) The policy does not prohibit sexually explicit letters, books, magazines, articles, or photographs if they do not show the images described above. (*Id.* ¶ 148.) Inmates are not prohibited from discussing sexual topics telephonically or during visitation. (*Id.*)

If sexually explicit materials are received for an inmate at the facility, an unauthorized property slip is provided to the inmate noting that the items were withheld due to their sexually offensive nature. (*Id.* ¶ 136.) Any withheld item is placed in the inmate's property box and returned to the inmate upon his release from YCDC. (*Id.* ¶ 137.) Because Plaintiff was released from YCDC custody on February 3, 2022, YCDC no longer possesses the images that were withheld. (*Id.* ¶ 138.)

CNA Entertainment is a "mail order LLC that caters solely to customers housed in local, state & federal correctional institutions." (*Id.* ¶ 139.) CNA sells sexual images to inmates. (*Id.*) Inmates can order individual 4 x 6 images, or a 100-image "grab bag" (or catalog) that contains multiple smaller images on each page. (*Id.*) YCDC does not prohibit all images received for inmates by CNA, or any other vendor, but prohibits any items that contain images of the body parts or actions described above. (*Id.* ¶ 140.) Such

determinations are made on an individualized basis for each image received from CNA or any other vendor.  (*Id.*)  Plaintiff received numerous photographs from CNA throughout his incarceration at YCDC. (*Id.* ¶ 141.)  Often, the CNA images Plaintiff received were not from CNA directly but were mailed to him from other individuals.  (*Id.*)

On August 5, 2021, Defendant Rangel sent correspondence to facility leadership noting that YCDC was seeing an influx in photographs sent by companies whose business model is to take nude pornographic photographs and alter them slightly to attempt to circumvent correctional institutions' prohibition on nude photographs.  (*Id.* ¶ 142.)  CNA is one of these companies.  (*Id.* ¶ 143.)  Defendant Rangel advised staff that, as they reviewed these images, to use best judgment to determine which are sexually explicit.  (*Id.* ¶ 144.)  He further noted that, while some images may be sexually explicit, some may not, and therefore each image should be analyzed to determine whether it meets the facility's definition of sexually explicit material.  (*Id.*)

Plaintiff submitted a grievance regarding the mail that was confiscated.  On August 27, 2021, Officer Macias responded to the grievance stating, "Be advised per policy any pictures displaying nudity or sexually offensive content will not be permitted and placed in your property bin as contraband.  Consider these items will be returned to you upon your release." (Doc. 128-3 at 39.)  Plaintiff submitted a grievance appeal.  (*Id.*)  On February 1, 2022, Officer Sosa responded to the grievance appeal stating that "reviews and spot checks of [the] requested photos" had been conducted, all incoming mail would be subject to censorship and inspections for contraband, and censorship would be limited in accordance with established guidelines.  (*Id.*)  The response stated, "Understand the remainder of those photos or packet were deemed to have or pose sexual orientated material and those photos were not approved.  Thus, the remainder of your pictures were placed in your property bin as an unauthorized item and will be provided to you upon your release from YCDC custody." (*Id.*)

### 3.   Official Capacity Claims

Plaintiff's official-capacity claims against Defendants Wilmot, Milner, Cooper, A.

Duarte, Gomez, Guerrero, and Oberosler are duplicative of his claims against Yuma County.  The Court will therefore grant Defendants' Motion for Summary Judgment as to Plaintiff's official-capacity claims.

### 4.    Legal Standard

As noted, prisoners enjoy a First Amendment right to send and receive mail. *Witherow*, 52 F.3d at 265, but their First Amendment rights are "necessarily limited by the fact of incarceration," *McElyea*, 833 F.2d at 197.  The Supreme Court has recognized that there are greater security concerns for incoming mail than for outgoing mail. *Thornburgh*, 490 U.S. at 412-13.  "Publishers have a First Amendment right to communicate with prisoners by mail, and inmates have a First Amendment right to receive this mail." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005)).  "But this right is subject to 'substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security.'" *Id.* (quoting *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990)).

### 5.    Analysis

#### a.    Rational Connection to Legitimate Governmental Interest

First, the Court must determine whether the governmental objective underlying YCDC's policy of excluding sexually explicit images is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective. *Thornburgh*, 490 U.S. at 414.  "In the prison context, regulations that apply to specific types of content due to specific inherent risks or harms are considered to be content neutral." *Bahrampour*, 356 F.3d at 975.

YCDC has a legitimate governmental interest in reducing sexual harassment, preventing a hostile environment for inmates and staff, facilitating rehabilitation and treatment objectives, and promoting the safe, secure, and orderly operation of the facility. The policy of excluding sexually explicit images is rationally related to those legitimate penological goals. *See Prison Legal News v. Ryan*, 39 F.4th 1121, 1132 (9th Cir. 2022) ("[I]t is rational for prison officials to restrict sexually explicit materials to mitigate prison

violence and advance related interests."). Moreover, there nothing on the face of the policy to indicate a desire to suppress expression. *Thornburgh*, 490 U.S. at 408 ("[T]he regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression."). The first *Turner* factor is satisfied.

### b.      Alternative Means of Exercising Right

Plaintiff has alternative means of exercising the right at issue because YCDC does not prohibit all access to sexually explicit material. *See Thornburgh*, 490 U.S. at 418 (stating where a regulation bans sexually explicit material that threatens institutional security, alternative avenues are available where "the regulations [at issue] permit a broad range of publications to be sent, received, and read"). The second *Turner* factor is satisfied.

### c.      Adverse Impacts of Accommodation

Defendants argue that the allowing sexually explicit images "would have a profound impact of, among others, violence against inmates and staff," particularly where, as here, Plaintiff has a history of assaulting staff. (Doc. 127 at 35-36.) Plaintiff has failed to present any argument or evidence to rebut Defendants' assertion. The third *Turner* factor is satisfied.

### d.      Obvious Alternatives/Exaggerated Response

Defendants contend "there is no evidence of any reasonable alternative to the restrictions" because the publications cannot "be limited to certain inmates or to being viewed in a separate section of the facility as the same safety and security concerns exist." (*Id.* at 36.) As noted, Plaintiff bears the burden of showing that there are obvious, easy alternatives to the regulation. *Mauro*, 188 F.3d at 1062. Plaintiff has presented no alternative to YCDC's policy and therefore has failed to meet his burden. The fourth *Turner* factor is satisfied.

### e.      Conclusion

On this record, the facts show that YCDC's policy is based on the legitimate penological goals of rehabilitation and maintaining security and that allowing Plaintiff to possess sexually explicit images would be counterproductive to these goals. Because the

record does not support a constitutional violation, Plaintiff's First Amendment claim fails. The Court will therefore grant the County Defendants' Motion for Summary Judgment in favor of Defendants Yuma County and Rangel as to Counts Six and Seven.

## VI.   *Williams #4 (CV-22-01163)*

### A.   Background

In *Williams #4*, Plaintiff alleges that on April 12, 2021 and November 8, 2021, Defendants used excessive force against him, in violation of the Eighth Amendment. (Doc. 1 at 10-13.)   Plaintiff also claims that the conditions during his transport from ADCRR to YCDC on May 5, 2022 violated his Eighth Amendment rights.  (*Id.* at 6-9.)

On screening, the Court determined that Plaintiff stated an Eighth Amendment conditions of confinement claim in Count One against Defendants Alvarez, Russom, Rendon, Cooper, Guerrero, Arriola, Ruelle, Sanchez and Lopez with respect to the May 5, 2022 transport.  (Doc. 9 at 7.)   The Court also determined that Plaintiff stated Eighth Amendment excessive force claims in Count Two against Defendants Aguayo, Lopez, Perez, Navarro, Zepeda, Rendon, and Hand; in Count Three against Defendant Perez; and in Count Four against Defendant Arriola.  (*Id.* at 8-9.)

### B.   Plaintiff's Allegations

On April 12, 2021, "following an incident where officers were refusing to transport him for a scheduled court appearance," Plaintiff "refused to surrender," through the cell door, the handcuffs he had been restrained in.  (Doc. 1 at 10.)   Defendant Rendon and others "repeatedly asked [him] to surrender the cuffs over a period of hours but [he] continued to refuse to do so" and, eventually, the officers entered his cell and used "force against [his] person," although Plaintiff was "never informed of the consequences and given the opportunity to comply based upon notice and informed knowledge."  (*Id.* at 10.)

Before the use of force, Defendant Ruelle and the jail's contract "psych doctor" came to Plaintiff's cell to speak with him and resolve the issue and then left.   (*Id.*) "[H]aving [taken] the time to reflect," Plaintiff decided to surrender the handcuffs and to comply with officers, but he was "never given the opportunity."  (*Id.*)  Defendants Aguayo,

Lopez, Perez, Navarro, and Zepeda entered his cell and began "assaulting" him "under the directions" of Defendants Rendon and Hand. (*Id.*) Defendant Hand twice tried to taser Plaintiff, but the taser malfunctioned. (*Id.*) Plaintiff was "slammed against the walls, the toilet/sink, and bunk area[,] and [he] was repeatedly punched in the head, face, and body with closed fists."

Defendant Perez punched Plaintiff in the face and head with "closed fisted 'upper cuts' and strikes 5 to 8 times, while [Plaintiff] was in handcuff restraints and being held in place by other officers, and not capable of resisting or defending [himself]." (*Id.* at 12.) Perez also repeatedly "pulled and yanked" Plaintiff's hair, pulling out a chunk of hair and causing a "bloody gash on the top of [Plaintiff's] head," after Plaintiff had been subdued and was lying on his stomach, handcuffed behind his back. (*Id.*) A "300 pound officer" was lying on Plaintiff's back, and he could not move or resist in any manner and "was not saying anything." (*Id.*) During a prior incident, Plaintiff explained to Perez that he "would not allow him to touch [Plaintiff's] hair, that for cultural and religious reasons . . . people who are not [his] family members are not allowed to touch [his] hair." (*Id.*)

On November 8, 2021, following "a staff assault incident," Plaintiff refused to surrender belly chain and handcuff restraints and was "initially resistant and combative with officers." (*Id.* at 13.) While officers were holding Plaintiff against the toilet/sink area in his cell, Defendant Arriola placed a taser on his left shoulder and "began emptying electrical currents through [Plaintiff's] body which immediately caused [him] to become incapacitated." (*Id.*) Although his body "froze up" and "resistance ceased," Defendant Arriola kept the taser pressed against Plaintiff's shoulder and "continued deploying voltages to [Plaintiff's] body . . . and throughout [Plaintiff's] slow descent to the ground." (*Id.*) After he was on the ground, Defendant Arriola placed the taser on Plaintiff's stomach and began "deploying electric currents through [Plaintiff's] body again for another 3 to 5 seconds." (*Id.*)

On May 5, 2022, Plaintiff was transferred from ADCRR to YCDC for a hearing in Yuma County Superior Court. (*Id.* at 6.) Upon arriving at the Jail, Plaintiff "was

- 58 -

non-compliant with certain DO directives"; he refused to be fingerprinted or photographed or submit to a strip search or any "body scan procedures." (*Id.*) However, Plaintiff was not assaultive or combative. (*Id.*) Although there "was an incident where [he] was alleged to have been in possession of contraband," the item was removed by a detention officer without incident. (*Id.*)

Defendants Arriola, Rendon, Ruelle, and Lopez escorted Plaintiff to the "F1-SMU1 unit," placed him in a cell, and, as punishment, removed the mattress from the cell and prohibited Plaintiff from having linens, bedding, or hygiene items. (*Id.*) Defendant Arriola also ordered that Plaintiff be placed in "SMU handcuffs," which are handcuffs connected by a solid piece of metal, instead of chain links, preventing the wearer from moving his hands "outside of the horizontal position" and immobilizing the hands with palms facing in and thumbs up. (*Id.*) The detention officers then left Plaintiff in the cell, restrained in the SMU handcuffs and leg shackles, for approximately twenty hours, "without any relief." (*Id.* at 7.)

After being in the cell for about one hour, Plaintiff notified Defendant Alvarez that he needed to defecate, and Defendant Alvarez responded, "oh well." (*Id.*) Plaintiff then explained he did not have toilet paper and could not use the restroom while restrained; Alvarez stated, "well you shouldn't have been acting how you were acting." (*Id.*) Plaintiff states Alvarez eventually brought him "2 to 3 feet of toilet paper and told [him] that per Sgt. Sanchez, the restraints will not be removed." (*Id.*) Plaintiff stated he could not defecate while restrained and, even if he could, he did not have enough toilet paper. (*Id.*) Defendant Alvarez told him to figure it out. (*Id.*)

After the shift change, Plaintiff notified Defendant Russom that he had never been fed lunch and had needed to defecate for several hours. (*Id.*) Defendant Russom told him, "You should have thought about that before you decided to misbehave" and walked away. (*Id.*) Plaintiff later asked to speak to Russom with the conversation recorded, that he be allowed to defecate, and that he be given bedding. (*Id.*) His requests were denied, and he was forced to "hold it in until [he] was returned to the prison over 20 hours later." (*Id.*)

Plaintiff spent the night shackled and handcuffed "in a freezing cold cell where [he] was forced to sit and lay on [and] ice cold concrete slab without any protections or relief[]." (*Id.*)  He was sleep deprived and had stomach pains from "holding in [his] waste"; was in pain from the restraints; lost feeling in his hands, arms, and legs; and, over time, the restraints began to cut into his body. (*Id.*)  His ankles "ended up being severely cut up and caused [him] significant and excruciating pain where the restraints continued to rub against and cut into [his] wounds throughout the night and through the following day." (*Id.*)

The next day, before being taken to court, Plaintiff demanded medical care for his wounds. (*Id.*)  Medical staff cleaned the wounds and applied ointment and Band-Aids, but the handcuffs were never removed. (*Id.*)  Plaintiff explained to a nurse about the pain he was in, and she asked the detention officers if they would allow Plaintiff to use the bathroom. (*Id.*)  Defendant Rendon denied the request. (*Id.*)  The restraints continued to rub through the Band-Aids, causing Plaintiff significant pain and causing his wounds to bleed again.

After the court proceedings, Defendants Cooper and Guerrero, under Defendant Arriola's instructions, placed Plaintiff in "some sort of contraption or device that rendered [his] body immobile and restrained [him] to an upright sitting position." (*Id.* at 8.)  Plaintiff was instructed to lay on his stomach on the floor on a reinforced blanket, which was then tightly wrapped around his legs and fastened with straps, preventing all movement of his legs. (*Id.*)  Plaintiff was then rolled over, placed in a sitting position, and placed in a vest that had a series of straps, loops, and buckles "connecting the 'straitjacket' life vest to the contraption on his legs." (*Id.*)  Plaintiff was secured in an upright, immobile position with his hands still cuffed behind his back and shackles still secured around his ankles. (*Id.*)  Because he had "not assaulted anyone and was not combative and was compliant with all orders, and since [he had] never in [his] life engaged in, and was not at that time engaging in, any type of self harm," he understood the restraints to be "punishment intended to torture and humiliate [his] person." (*Id.*)

Defendant Ruelle and another officer took documentary photos of Plaintiff and then carried him out to a vehicle and strapped him into the back seat.  (*Id.*)  Defendant Cooper tried to have a spit mask placed over Plaintiff's face and head, even though Plaintiff was not, and had never, "engag[ed] in any such conduct." (*Id.*)  Defendant Guerrero was "taking pictures and recording video with his personal cell phone while laughing [at Plaintiff] and joking about [Plaintiff's] condition with other [officers]." (*Id.*)

Plaintiff was transported from Yuma to ADCRR, an approximately three-and-a-half-hour drive, in the restraints.  (*Id.*)  Plaintiff suffered severe pain in his arms and shoulders, and his legs and feet "fell asleep" due to lack of movement.  (*Id.* at 9.)  Plaintiff was in the restraints for a total of four to five hours.  (*Id.*)

After arriving at the prison, Defendant Guerrero "invited the prison's captain and [sergeants] to come out and view the conditions they had placed [Plaintiff] in" and "stood around laughing and joking." (*Id.*)  When the restraints were removed, Plaintiff could not walk or stand until he regained circulation in his legs and feet. (*Id.*)  Plaintiff was secured in handcuffs and leg irons for the approximately twenty-eight hours he was in Yuma County Sheriff's Office's custody.  (*Id.*)  During eighteen of those hours, he was locked inside of a cell in full restraints and unattended, was never "seen or evaluated by any medical staff," and his restraints were not "checked or [his] condition evaluated by medical or jail staff." (*Id.*)  Similarly, after he was placed in the restraint "contraption," he was not seen or evaluated by any medical staff.  (*Id.*)

## C.  Defendants' Facts

### 1.  April 12, 2021, Incident

At approximately 9:50 am on April 12, 2021, officers arrived at Plaintiff's cell to transport him to court.  (CDSOF ¶ 76.)  Plaintiff was ordered to place his hands through the wicket cell door so that officers could place hand restraints on him.  (*Id.*)  Plaintiff complied with this order, but instead of following the command to kneel on his bed, to allow officers to enter and place additional necessary restraints on him, Plaintiff ignored the directive and sat on his bed.  (*Id.*)  Plaintiff was given additional verbal commands to

kneel on his bed, but ignored them, indicating he would only comply if he was given a razor and hand soap. (*Id.*) Defendant Caudillo advised Plaintiff that he would not receive these items because he was required to be transported to court at that time. (*Id.* ¶ 77.) Despite further verbal commands by officers, Plaintiff ignored all commands and remained in his cell with the hand restraints on and hands behind his back. (*Id.*)

Plaintiff was ordered to come to the wicket cell door to allow officers to remove his hand restraints, since he refused to be transported to court, but instead of complying, Plaintiff moved his hand restraints from behind his back to the front of his body. (*Id.* ¶ 78.) Plaintiff continued to refuse to approach the wicket cell door to allow officers to remove his hand restraints. (*Id.*)

At approximately 10:00 am, due to Plaintiff's continued refusal to return the hand restraints, IPC (interpersonal communication) skills were used by officers, supervisors, and mental health providers multiple times to get Plaintiff to comply with orders and give up his hand restraints. (*Id.* ¶ 79.) These IPC skills were unsuccessful. (*Id.*) As such, Plaintiff remained in his cell in hand restraints. (*Id.*)

Plaintiff did not present any harm to himself or others while the hand restraints remained on, and to avoid additional confrontation, it was decided to leave the hand restraints on Plaintiff until he was willing to surrender them. (*Id.* ¶ 80.) At approximately 1:50 pm, Plaintiff covered his cell window with his mattress. (*Id.* ¶ 81.) Because officers were unable to get a visual of Plaintiff inside his cell, they could not account for any movement or signs of wellbeing. (*Id.*)

A cell entry team was assembled to gain access to Plaintiff's cell to remove the mattress that covered the cell window. (*Id.* ¶ 82.) Defendant Rendon assembled the cell entry team consisting of Defendants Lopez, Hand, Perez, Aguayo, Zepeda, and Navarro. Defendant Rendon briefed these officers of the situation and explained that due to Plaintiff's refusal to give up the hand restraints, and the fact that Plaintiff was covering his cell door with his mattress, entry was necessary. (*Id.*) Defendant Rendon explained to all officers how the entry would be executed and what their individual roles would be. (*Id.*)

1    After the officers geared up, at approximately 2:14 pm, the officers made entry into
2    Plaintiff's cell as directed by Defendant Rendon.  (*Id.* ¶ 83.)  Defendant Rendon maintained
3    control of the incident and issued all commands and orders to the six officers to follow
4    during the incident.  (*Id.* ¶ 84.)

5    Defendant Aguayo was the first officer to enter Plaintiff's cell.  (*Id.* ¶ 87.)  Aguayo
6    was equipped with a shock shield, which is used in situations where a barrier between
7    officers and an inmate is necessary.  (*Id.*)  The shock shield is also used to push back objects
8    (like a mattress) that an inmate is using to push against officers entering the cell.  (*Id.*)
9    When Plaintiff's cell door was opened, Aguayo immediately pushed the mattress and
10   Plaintiff back to gain entry.  (*Id.*)  Plaintiff used his mattress to push against Aguayo,
11   causing Aguayo to fall to the floor.  (*Id.*)

12   Defendant Lopez was the second officer to enter Plaintiff's cell.  (*Id.* ¶ 89.)  Lopez
13   was assigned as the right-side control officer and was tasked with gaining control of
14   Plaintiff's upper right side of his body.  (*Id.*)  Upon entry, Plaintiff attempted to strike the
15   officers with his head.  (*Id.*)  As Defendant Aguayo attempted to corner Plaintiff with the
16   shock shield on the west side wall between his toilet and door, Plaintiff headbutted
17   Defendant Lopez.  (*Id.*)  Lopez attempted to gain control of Plaintiff by placing him on his
18   stomach, but due to Plaintiff's continued resistance and failure to comply with verbal
19   commands, this was not immediately successful.  (*Id.*)

20   Defendant Perez was the third officer to enter Plaintiff's cell.  (*Id.* ¶ 92.)  Perez was
21   tasked with gaining control of Plaintiff's left side.  (*Id.*)  Perez also gave Plaintiff loud
22   commands to stop resisting, but Plaintiff failed to comply.  (*Id.*)  Perez was able to grab
23   Plaintiff's left arm and pull Plaintiff to the south side of the room where the bed was
24   located.  (*Id.*)  Plaintiff pushed his weight against Perez, causing Plaintiff to fall towards
25   Perez on the bed.  (*Id.*)  Perez attempted to move Plaintiff, but Plaintiff struck Perez's legs
26   with his head.  (*Id.*)

27   After Plaintiff continued to push his weight onto Defendant Perez, Perez applied
28   three hammer fist strikes to Plaintiff's shoulder area to stop him from continuing to strike

Perez's legs and abdomen with his head.  (*Id.*)  A hammer strike is a closed fist strike that is applied at a downward motion.  (*Id.*)  The purpose of a hammer strike is to gain control and compliance.  (*Id.*)  As Perez applied the three hammer strikes, Plaintiff continued to use his head to strike Perez and continued to resist.  (*Id.*)  Perez gave loud verbal commands for Plaintiff to stop resisting, but Plaintiff failed to do so.  (*Id.*)  Perez then maneuvered his position and gained control of Plaintiff's arm with an escort hold.  (*Id.*)

Defendant Navarro was the fourth officer to enter Plaintiff's cell.  (*Id.* ¶ 97.) Navarro was tasked with applying leg restraints and controlling Plaintiff's bottom left side. (*Id.*)  Initially, Navarro was unable to get hold of Plaintiff due to Plaintiff's position between the toilet and bed in the cell.  (*Id.*)  Due to Plaintiff's continued resistance and attempts to strike officers with his head, Navarro applied two hammer strikes to Plaintiff's shoulder area. (*Id.*)   Navarro gained control of Plaintiff, and no further hammer strikes were applied.  (*Id.*)

Defendant Zepeda was the fifth officer to enter the cell and was tasked with controlling Plaintiff's legs and applying right leg restraints.  (*Id.* ¶ 99.)  Due to Plaintiff's aggressive behavior and continued resistance, Zepeda could not initially see Plaintiff's legs to apply the restraints.  (*Id.*)  Once he had a visual, Zepeda applied the right leg restraint and passed the left leg restraint to Defendant Navarro to secure Plaintiff's left leg.

Defendant Hand was the sixth officer to enter Plaintiff's cell and was assigned to the taser.  (*Id.* ¶ 102.)  Hand gave multiple commands to Plaintiff and warned him that a taser would be used if he did not stop resisting.  (*Id.*)  After several failed commands, Hand displayed the taser, followed by the command "Taser Taser." (*Id.*)  He attempted to cycle the taser, but it malfunctioned and did not process.  (*Id.*)  Plaintiff saw the taser and began to comply with the officers' commands.  (*Id.*)  Hand determined his presence and the use of the taser was no longer needed, and he exited Plaintiff's cell and remained outside the cell until the conclusion of the incident at approximately 2:38 p.m.  (*Id.*)

Once the officers gained control of Plaintiff, Defendant Rendon ordered the officers to place Plaintiff on his bed, facing down to gain better control and allow the application

1   of restraints.  (*Id.* at ¶ 99)  Plaintiff continued to resist and placed his hands over his head

2   making it difficult for officers to maintain control of Plaintiff.  (*Id.*)  Defendant Zepeda

3   remained in control of Plaintiff's right leg and double locked the restraints.  (*Id.*)  Zepeda

4   also positioned Plaintiff's uniform pant leg in between the leg restraint and his ankle to

5   prevent friction on his skin.  (*Id.*)  Defendant Perez assisted Defendant Aguayo with

6   removing Plaintiff's hand restraints, repositioning Plaintiff's hands behind his back, and

7   reapplying the hand restraints.  (*Id.* ¶ 92.)  After the hand restraints were secured, Defendant

8   Rendon ordered Defendant Perez to exit the cell and stand by for medical. (*Id.*)

9       Plaintiff was evaluated by medical staff at approximately 2:20 pm for any sustained

10  injuries and to ensure all restraints were properly placed and not too tight.  (*Id.* ¶ 89.)

11  Plaintiff was found to be in stable condition with normal vitals, no injuries were noted,

12  medical staff confirmed the restraints placed on Plaintiff were not too tight, and it was

13  determined that no further medical attention was needed.  (*Id.* ¶¶ 89, 105.)

14      After Plaintiff's medical evaluation, Defendants Lopez and Aguayo pat searched

15  Plaintiff for weapons or contraband.  (*Id.* ¶ 85.)  During the search, plastic wrap was

16  discovered around Plaintiff's genitals.  (*Id.*)  Defendant Rendon removed the plastic wrap

17  and ordered Plaintiff's uniform pants and underwear to be removed to conduct a more

18  thorough search of Plaintiff's genitals, as Plaintiff had a history of wrapping plastic around

19  his genitals to conceal weapons.  (*Id.*)

20          **2.      November 8, 2021, Incident**

21      At 9:31 a.m. on November 8, 2021, Defendant Arriola responded to a request for

22  backup officers in the F1 housing unit because Plaintiff assaulted an officer.  (*Id.* ¶ 106.)

23  As he entered the F1 unit, Defendant Arriola learned Plaintiff headbutted Officer Hand.

24  (*Id.* ¶ 107.)  After all officers exited Plaintiff's cell, and Plaintiff's cell door was secured,

25  Defendant Arriola saw Plaintiff stand up from the bed and remove the restraints from

26  around his waist.  (*Id.* ¶ 108.) These restraints remained connected to Plaintiff's hands.

27  (*Id.*)  Plaintiff failed to comply with commands to come to the door of his cell so that his

28  restraints could be removed.  (*Id.* ¶ 109.)  An extraction team was assembled to enter

Plaintiff's cell to gain compliance.  (*Id.* ¶ 110.)

Officers attempted to enter Plaintiff's cell, but he kept the cell door from opening by pushing against the door.  (*Id.* ¶ 111.)  Defendant Arriola removed his Oleoresin Capsicum Aerosol spray from his belt, but since he did not have a clear view of Plaintiff, he did not deploy it.  (*Id.* ¶ 112.)  Arriola removed his taser from his belt, but he did not have a clear view of Plaintiff and therefore did not deploy his taser.  (*Id.* ¶ 113.)

After a few minutes, officers were able open Plaintiff's cell door.  (*Id.* ¶ 114.)  As the cell door opened, Plaintiff attempted to escape.  (*Id.*)  The officers pushed Plaintiff back inside the cell to prevent him from escaping.  (*Id.*)  Defendant Arriola observed Plaintiff swinging the waist restraint to strike the officers.  (*Id.*)  He also observed Plaintiff attempting to strike officers with closed fists.  (*Id.*)  Officers gave Plaintiff loud and continuous verbal commands to stop resisting, but he did not comply.  (*Id.*)

Defendant Arriola removed his taser, but because he did not have a clear view of Plaintiff, he did not deploy it.  (*Id.* ¶ 115.)  He gave Plaintiff commands to stop resisting, but Plaintiff continued to fight and attempt to strike officers with the waist restraints and closed fists.  (*Id.* ¶ 116.)  Defendant Arriola deployed the taser in "drive stun" mode to Plaintiff's upper left torso/chest area.  (*Id.*)  A taser has two modes— "probe" and "drive-stun."  (*Id.* ¶ 129.)  In "probe" mode, two small probes are deployed from the taser cartridge and are intended to attach to the intended recipient's skin or clothes to complete the circuit back to the taser and cause temporary neuromuscular incapacitation.  (*Id.*)  In "drive-stun" mode, the cartridge is applied to the skin as a pain compliance technique.  (*Id.*)  It is a lesser quantum of force than deploying the probes.  (*Id.*)

Plaintiff continued to resist officers and use the waist restraints as a weapon.  (*Id.* ¶ 117.)  Defendant Arriola deployed the taser in "drive-stun" mode first to Plaintiff's upper left torso/chest area through his uniform for three to five seconds.  (*Id.*)  Plaintiff continued to resist officers and cling to his waist restraints.  (*Id.*)  Defendant Arriola repositioned the taser to Plaintiff's lower torso/stomach area, and again deployed the taser through Plaintiff's uniform for three to five seconds.  (*Id.*)  This caused Plaintiff to stop

fighting and comply with Defendant Arriola's commands.  (*Id.*)  Officers were able to secure Plaintiff's hands behind his back with hand restraints. The officers remained in Plaintiff's cell with Plaintiff restrained until 10:00 a.m., until he was evaluated by medical staff.  (*Id.* ¶ 131.)

Plaintiff remained secured in his cell.  (*Id.* ¶ 118.)  Defendant Arriola observed Plaintiff cover his cell door window with his mattress, which prevented officers from being able to observe his movements, but there were no further incidents.  (*Id.*)

### 3.  May 5, 2022, Incident

On May 5, 2022, Plaintiff was transported from ASPC-Eyman in Florence, Arizona to YCDC for a court hearing the next day.  (*Id.* ¶ 149.)  Defendants Lopez, Ruelle, and Rendon were working in transportation and assigned to transport Plaintiff from ASPC-Eyman to YCDC. (*Id.* ¶ 150.)  Although he was restrained during the drive, Plaintiff broke the interior camera wiring in the transport van, which disrupted the surveillance video that was used to monitor Plaintiff during the drive.  (*Id.* ¶ 152.)  Plaintiff also destroyed the seatbelt stitching and removed the metal seatbelt buckle.  (*Id.*)  Plaintiff concealed the metal seatbelt buckle from officers by attaching it to a string and securing it to his genitals.  (*Id.*)

Upon arriving to YCDC, Plaintiff refused to be strip searched, comply with a full body scan, remove his ADCRR uniform to exchange it for a YCDC uniform, and have a booking photograph taken.  (*Id.* ¶ 153.)  Due to these refusals, Defendant Ruelle assisted in searching Plaintiff in the booking area.  (*Id.* ¶ 154.)  Defendant Ruelle searched the left side of Plaintiff's body, and Defendant Rendon searched the right side of his body.  (*Id.*)  During this search, the metal seatbelt buckle described above was discovered tied around Plaintiff's penis.  (*Id.*)

After the hearing on May 6, 2022, Plaintiff was transported back to ASPC-Eyman.  (*Id.* ¶ 157.)  For the transport back to ASPC-Eyman, Defendant Guerrero directed that Plaintiff be placed in a restraint wrap that wrapped his lower body and legs and restrained his hands behind his back.  (*Id.* ¶ 163.)  The wrap was used due to Plaintiff's extensive

history of manipulating and removing his restraints, manufacturing and concealing weapons, and the two incidents that occurred during the transport the day prior.  (*Id.*)  The wrap was placed on Plaintiff immediately before he was placed in the transportation vehicle to be transported back to ASPC-Eyman.  (*Id.*)  Defendant Guerrero took photos of Plaintiff in the restraints for documentation purposes before he departed from YCDC.  (*Id.* ¶ 164.)

Plaintiff was transported back to ASPC-Eyman in a YCSO Explorer, as opposed to a prisoner transport van.  (*Id.* ¶ 165.)  The YCSO Explorer has a clear divider between the backseat and front seat, to allow officers in the front seat to maintain constant visualization of the inmate in the backseat.  (*Id.*)  Due to the incidents that occurred on the transport to YCDC, his vehicle allowed officers to maintain a visual of Plaintiff during the entirety of the transport.  (*Id.*)  As an additional security measure, Defendant Guerrero followed the YCSO Explorer transporting Plaintiff in a chase car to provide additional assistance to the transporting officers should it have been needed.  (*Id.*)  The transport from YCDC to ASPC-Eyman took approximately three and a half hours.  (*Id.* ¶ 166.)

Upon arrival to ASPC-Eyman, Defendant Guerrero spoke with ASPC-Eyman personnel about the transfer of Plaintiff and completed the process for transferring Plaintiff back to ADCRR custody. (*Id.* ¶ 167.)  This included completing the necessary paperwork, ASPC Eyman personnel inspecting Plaintiff, the restraint wrap being removed, and ASPC-Eyman personnel taking physical custody of Plaintiff.  (*Id.*)

Defendant Alvarez did not deny Plaintiff toilet paper, instead he provided Plaintiff with approximately two to three feet of toilet paper and indicated he could have more once the amount he provided him had been used.  (*Id.* at 170.)  If Plaintiff asked for more, he would have provided it. (*Id.*)  However, he did not.  (*Id.*)

### D.    Analysis of April 12, 2021, Incident (Counts Two and Three)

As noted, the Court must consider several factors in determining whether a defendant's use of force was malicious and sadistic for the purpose of causing harm:  (1) the extent of the injury, (2) the need for force, (3) the relationship between the need and

the amount of force used, (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the severity" of the force.  *McMillan*, 503 U.S. at 7.

### 1.    Extent of Injury

The extent of a prisoner's injury may suggest whether force used could plausibly have been thought necessary in a particular situation.  *Id*.  "The extent of injury may also provide some indication of the amount of force applied."  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  Although the extent of a prisoner's injury is relevant in the use of force determination, it is not decisive because a prisoner can state a claim even if he did not suffer a significant injury.  *See id.* at 38; *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (noting the attack need not result in permanent injury).  Injury and force "are only imperfectly correlated, and it is the latter that ultimately counts."  *Gaddy*, 559 U.S. at 38.

According to the verified Complaint, during the April 12, 2021 incident, Defendant Perez punched Plaintiff in the face and head with "closed fisted 'upper cuts' and strikes 5 to 8 times, while [Plaintiff] was in handcuff restraints and being held in place by other officers, and not capable of resisting or defending [himself]."  (Doc. 1 at 12.) Perez also repeatedly "pulled and yanked" Plaintiff's hair, pulling out a chunk of hair and causing a "bloody gash on the top of [Plaintiff's] head," after Plaintiff had been subdued and was lying on his stomach, handcuffed behind his back.  (*Id*.)  A "300 pound officer" was lying on Plaintiff's back, and he could not move or resist in any manner and "was not saying anything."  (*Id*.)

Defendants have presented evidence that Plaintiff did not suffer any injury during the incident.  According to Defendant Perez's Use of Force Tracking/Notification Form, Perez applied three hammer fist strikes to Plaintiff's shoulder area to gain compliance, which did not injure Plaintiff.  (Doc. 128-2 at 85.)  Likewise, Defendant Navarro's Use of Force Tracking/Notification Form states that Navarro applied two hammer first strikes to Plaintiff's shoulder area to gain compliance, which did not injure Plaintiff.  (*Id.* at 93.) Defendant Perez's Incident Report states that at 2:20 p.m., Defendant Vargas assessed

1    Plaintiff for "any sustained injuries and ensured all restraints were not on too tight." (*Id.*

2    at 87.)   The Incident Report states that Defendant Vargas informed the officers that

3    Plaintiff's vitals were normal, and no further medical attention was needed. (*Id.*)

4         Accepting as true that Defendant Perez repeatedly pulled and yanked Plaintiff's hair

5    and pulled out a chunk of Plaintiff's hair, which caused a bloody gash on his head, the

6    Court finds that Plaintiff suffered slightly more than a de minimis injury.  This factor

7    weighs in favor of Plaintiff.

8                        **2.      Need for Force**

9         The Ninth Circuit has held that "the force which was applied must be balanced

10   against the need for that force: it is the need for force which is at the heart of the [excessive

11   force determination]." *Alexander v. City and Cnty. of S.F.*, 29 F.3d 1355, 1367 (9th Cir.

12   1994), *abrogated on other grounds by Cnty. of L.A. v. Mendez*, 581 U.S. 420 (2017).  The

13   use of force may be necessary "if a prisoner refuses after adequate warning to move from

14   a cell or upon other provocation presenting a reasonable possibility that slight force will be

15   required." *Spain*, 600 F.2d at 195.

16        The evidence demonstrates that Plaintiff's behavior created the need for force.  After

17   Defendants allowed Plaintiff to remain handcuffed in his cell for several hours, Plaintiff

18   covered his cell window with his mattress, which prompted Defendant Rendon to order a

19   cell entry.  When officers tried to enter his cell, Plaintiff used his weight to push against

20   the mattress to prevent their entry.  Defendants initially tried to gain Plaintiff's compliance

21   through verbal commands and by placing him on his stomach, but Plaintiff failed to comply

22   with commands and physically resisted the officers.  Although several officers tried to gain

23   control of Plaintiff, he continued to fight and resist them.  This factor weighs in favor of

24   Defendants.

25                 **3.      Relationship Between Need and Amount of Force Used**

26        As stated, the standard under the Eighth Amendment is "malicious and sadistic

27   force, not merely objectively unreasonable force." *Clement v. Gomez*, 298 F.3d 898, 903

28   (9th Cir. 2002).   Corrections officers must balance the need to "maintain or restore

discipline" through force against the risk of injury to a prisoner. *McMillan*, 503 U.S. at 6. In analyzing the relationship between the need for force and the force used, a simple overreaction by an officer is not enough to establish an Eighth Amendment violation: "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the" Eighth Amendment. *Whitley*, 475 U.S. at 319. Thus, objectively unreasonable force, without more, is not a violation. *See Clement*, 298 F.3d at 903. The infliction of pain during a prison security measure is not cruel and unusual punishment "simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. Officers may use force only in proportion to the need in each situation. *See Spain*, 600 F.2d at 195 ("The infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self-defense . . . . Inherent in the doctrine of self-defense is the concept of proportion.").

Here, the evidence demonstrates that despite Defendants' attempts to subdue Plaintiff, Plaintiff headbutted Defendant Lopez and pushed his weight against Defendant Perez and struck Perez's legs with his head. Defendant Perez applied three hammer strikes to Plaintiff's shoulder area to stop Plaintiff from continuing to strike Perez's legs and abdomen with his head. Defendant Navarro applied two hammer strikes to Plaintiff's shoulder area. A closed fist strike applied at a downward motion, like a hammer strike, to the shoulder area is less likely to cause significant injury. Defendants did not use any greater force than the hammer strikes during the incident; although Defendant Hand attempted to deploy his taser, it malfunctioned and did not deploy. This factor weighs in favor of Defendants.

### 4.      Threat Reasonably Perceived

The fourth *Hudson* factor considers "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley*, 475 U.S. at 321. In weighing this factor, courts should be

mindful that "in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." *Id.* at 320.

Defendants reasonably perceived that Plaintiff posed a threat to them.  As noted, when officers tried to enter the cell, Plaintiff pushed against the mattress, causing Defendant Aguayo to fall to the floor; headbutted Defendant Lopez; and pushed his weight against Defendant Perez and struck Perez's legs with his head.  This factor weighs in favor of Defendants.

### 5.      Efforts to Temper Severity of Force

The fifth factor to consider is Defendants' efforts to minimize the severity of the forceful response.  In analyzing this factor, the Court must keep in mind that the Eighth Amendment does not prohibit uses of force that appear unreasonable in hindsight, as long as the officers were acting in good faith and for a legitimate end.  *See id.* at 322.

The evidence indicates that Defendants used only as much force as was necessary to subdue Plaintiff and stopped using force once he was compliant.  This factor weighs in favor of Defendants.

On this record, no reasonable jury could conclude  Defendants used excessive force against Plaintiff during the April 2021 incident.  The Court will therefore grant Defendants' Motion for Summary Judgment as to Counts Two and Three.

### E.      Analysis of November 8, 2021, Incident (Count Four)

### 1.      Extent of Injury

Other than the fact that he was tased, there is no evidence that Plaintiff suffered any injury during the November 8, 2021 incident.  However, a taser can inflict pain and cause serious injury.  *See Bryan v. McPherson*, 630 F.3d 805, 825 (9th Cir. 2010); *Kaady v. City of Sandy*, CV-06-1269-PK, 2008 WL 5111101, at *16 (D. Or. Nov. 26, 2008) ("While the Taser does not typically cause any lasting injury or pain, being shocked by a Taser is a painful experience.").  This factor weighs in favor of Plaintiff.

1

2.       **Need for Force**

2        The evidence demonstrates that Defendant Arriola responded to a report that

3    Plaintiff had headbutted Defendant Hand.  Plaintiff removed his waist restraints and failed

4    to comply with commands to come to his cell door so that the restraints could be removed

5    from his hands.  When officers tried to enter the cell, Plaintiff pushed against the door, and

6    when the door opened, Plaintiff tried to escape.  Plaintiff's conduct created the need for

7    force to gain his compliance.  This factor weighs in favor of Defendant Arriola.

8

3.       **Relationship Between Need and Amount of Force Used**

9        During the incident, Defendant Arriola deployed his taser three times in "drive stun"

10   mode to Plaintiff's upper left torso/chest area for three to five seconds each time.  District

11   courts in the Ninth Circuit have "assume[d] that the taser use in drive stun mode constituted

12   a somewhat less than intermediate level of force."  *Lerma v. City of Nogales*,

13   CV-12-518-TUC-FRZ, 2014 WL 4954421, at *8 (D. Ariz. Sept. 30, 2014); *see also Mattos*

14   *v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc) ("When a taser is used in drivestun

15   mode, the operator removes the dart cartridge and pushes two electrode contacts located

16   on the front of the taser directly against the [recipient].  In this mode, the taser delivers an

17   electric shock to the [recipient], but it does not cause an override of the [recipient's] central

18   nervous system as it does in dart-mode."); *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th

19   Cir. 2010) (observing in Fourth Amendment excessive force case that that "the Taser, in

20   general, is more than a non-serious or trivial use of force but less than deadly force," but

21   "there is a lot of room between these end points").

22       Accepting as true the allegations in the verified Complaint, Defendant Arriola first

23   deployed his taser while officers were holding Plaintiff against the toilet/sink area in his

24   cell.  The first taser deployment immediately caused Plaintiff to become incapacitated.

25   Although Plaintiff's body "froze up" and "resistance ceased," Defendant Arriola kept the

26   taser pressed against Plaintiff's shoulder and "continued deploying [the taser]" during

27   Plaintiff's "slow descent to the ground."  (*Id.*)  After Plaintiff was on the ground, Defendant

28   Arriola placed the taser on Plaintiff's stomach and began "deploying electric currents

through [Plaintiff's] body again for another 3 to 5 seconds." (*Id.*)  A reasonable jury could conclude that Defendant Arriola continued to use the taser against Plaintiff after he was already subdued and there was no longer a need for any force.  This factor weighs in favor of Plaintiff.

### 4.      Threat Reasonably Perceived

Accepting as true the allegations in the verified Complaint, even if Defendant Arriola initially perceived that Plaintiff posed a threat to officers by swinging the waist restraint and trying to strike officers with closed fists, when Arriola first deployed the taser, officers were holding Plaintiff against the toilet/sink in the cell, and after the first taser use, Plaintiff was incapacitated.  A reasonable jury could conclude that when Arriola deployed the taser, Plaintiff no longer posed a threat to officers.  This factor weighs in favor of Plaintiff.

### 5.      Efforts to Temper Severity of Force

Again, assuming the truth of allegations in the verified Complaint, Defendant Arriola used force against Plaintiff after he was incapacitated.  Even if the first taser deployment was necessary to subdue Plaintiff, Arriola continued to use the same quantum of force even after Plaintiff was incapacitated.  This factor weighs in favor of Plaintiff.

Based on the available evidence, there are genuine disputes of material fact regarding whether Defendant Arriola used excessive force against Plaintiff during the November 2021 incident.

### 6.      Qualified Immunity

As noted, Defendants argue that they are entitled to qualified immunity with respect to all of Plaintiff's claims, but they do not make any specific arguments with respect to any particular claim.

The Supreme Court has recognized that "specificity is especially important in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)

1   (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  "Use of excessive force is an area of
2   the law 'in which the result depends very much on the facts of each case,' and thus police
3   officers are entitled to qualified immunity unless existing precedent 'squarely governs' the
4   specific facts at issue."  *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 12).
5   "Plaintiffs asserting excessive force claims must thus point to an existing rule that 'squarely
6   governs' the facts at issue and that moves the officer's actions outside the 'hazy border
7   between excessive and acceptable force.'"  *Hopson v. Alexander*, 71 F.4th 692, 698
8   (quoting *Brosseau*, 543 U.S. at 201); *see also Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6
9   (2021) (holding burden is on the plaintiff to identify precedent "that put [the defendant] on
10  notice that his specific conduct was unlawful").

11      To the extent Defendants seek to assert qualified immunity on the second prong—
12  that Defendant Arriola did not violate any clearly established rights of which a reasonable
13  officer would have known—Defendants fail to identify the right at issue.  Plaintiff has the
14  burden to show that the right was clearly established at the time; however, Defendants did
15  not expressly argue this right was not clearly established.

16      "'[C]learly established law must be 'particularized' to the facts of the case."  *White*,
17  580 U.S. at 79 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "[G]eneral
18  statements of the law are not inherently incapable of giving fair and clear warning" to
19  officers, but in the light of pre-existing law the unlawfulness must be apparent."
20  *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).  "An officer 'cannot be
21  said to have violated a clearly established right unless the right's contours were sufficiently
22  definite that any reasonable official in the defendant's shoes would have understood that
23  he was violating it.'"  *Kisela*, 584 U.S. at 105 (quoting *Plumhoff v. Rickard*, 572 U.S. 765,
24  778-779 (2014)).

25      Considering the specific context of the case, the right at issue here is the right of an
26  incapacitated prisoner to be free from the unnecessary use of force.  Whether Defendant
27  Arriola is entitled to qualified immunity turns on whether Plaintiff was incapacitated at any
28  point before Arriola deployed the taser the third time.  Because there is a genuine dispute

regarding this issue, summary judgment is not appropriate.  *See City of Oakland*, 350 F.3d at 956 ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.").  The Court will deny Defendants' Motion for Summary Judgment as to Count Four.

### F.     Conditions of Confinement (Count One)

Plaintiff asserts that several aspects of his transport on May 5 and 6, 2022 violated his Eighth Amendment rights.  As noted, to prevail on an Eighth Amendment conditions of confinement claim, Plaintiff must show that Defendants knew of and disregarded an excessive risk to his health or safety.  *Farmer*, 511 U.S. at 837

First, the evidence demonstrates that Defendants Lopez, Rendon, and Ruelle's only involvement with the transport was that they drove Plaintiff from ASPC-Eyman to YCDC on May 5, 2022, and during that drive, Plaintiff, despite being restrained, broke the interior camera wiring in the transport van, destroyed the seatbelt stitching, removed the metal seatbelt buckle, and concealed it from officers by attaching it to a string and securing it to his genitals.  At YCDC, Plaintiff refused to be strip searched. Defendant Ruelle searched the left side of Plaintiff's body, and Defendant Rendon searched the right side of his body, and they found a metal seatbelt buckle tied around Plaintiff's penis.  As for Defendant Lopez, he avers that he made no decisions regarding Plaintiff's conditions of confinement while he was being transported to and from YCDC and was not involved in the decision to use the restraint wrap on Plaintiff during the transport back to ASPC-Eyman.  (Doc. 128-5 at 125-26 ¶¶ 29, 34, 38.)  Defendants Lopez, Rendon, and Ruelle's conduct on May 5, 2022 does not implicate the Eighth Amendment.

Second, although the parties dispute how long Plaintiff was subjected to some kind of restraint—twenty-eight hours according to Plaintiff and "less than a day" according to Defendants—even if Plaintiff was restrained for twenty-eight hours, that alone does not amount to an Eighth Amendment violation.  Defendant Arriola avers that he never ordered Plaintiff to be placed in "SMU hand restraints" on May 5, 2022 and that SMU hand

1  restraints are "structurally similar to all other hand restraints used in the facility."

2  (Doc. 128-4 at 296 ¶ 33.)  But even if Defendant Arriola did order the use of "SMU

3  handcuffs," there is no evidence that Arriola was aware of and disregarded a substantial

4  risk of harm to Plaintiff's health or safety by using the handcuffs during the transport.

5  Plaintiff's ankles "ended up being severely cut up" and caused him significant pain where

6  the restraints continued to rub against and cut into his wounds throughout the night and

7  through the following day, but there is no evidence that Lopez was aware that the restraints

8  had caused any wounds to Plaintiff.

9        Third, Defendant Russom denies that Plaintiff ever told him that he needed to

10  defecate or that he told Plaintiff "you should have thought about that before you decided

11  to misbehave." (Doc. 128-4 at 232 ¶ 10.)  Defendant Alvarez denies that he responded to

12  Plaintiff's statement that he needed to defecate by saying, "oh well" and that Plaintiff

13  would have to "figure it out." (Doc. 128-5 at 56-57 ¶ 11, 13.)  But even accepting these

14  facts as true, Defendants Russom and Alvarez's conduct does not amount to an Eighth

15  Amendment violation. *See*, *e.g.*, *Kanvick v. Nevada,* No. 3:08-CV-00397, 2010 WL

16  2162324, at *5-6 (D. Nev. Apr. 27, 2010) ("[A] temporary deprivation of access to toilets

17  [lasting up to two hours], in the absence of physical harm or a serious risk of contamination,

18  does not rise to the level of an Eighth Amendment violation."); *Owens v. Padilla*, No. C

19  06-4778, 2008 WL 3916068, at *4 (N.D. Cal. Aug. 22, 2008) (holding confinement in

20  prison barbershop for six hours without access to bathroom did not state Eighth

21  Amendment claim).  Although Plaintiff claims his subsequent requests to defecate were

22  denied and he was forced to "hold it in until [he] was returned to the prison over 20 hours

23  later," it is undisputed that Plaintiff had access to a toilet in his cell, and there is no evidence

24  that he made any other request to a named Defendant that was denied.  And even if Alvarez

25  denied Plaintiff extra toilet paper, that does not amount to an Eighth Amendment violation.

26        With respect to the other conditions in the F1 cell at YCDC, staying one night in a

27  cell that did not have a mattress, bedding, or hygiene items does not rise to the level of an

28  Eighth Amendment violation.  *See Hernandez v. Denton*, 861 F.2d 1421, 1424 (9th Cir.

1988), *judgment vacated on other grounds*, 493 U.S. 801 (1989) (holding allegation that inmate slept without a mattress for one night insufficient to state a claim under Eighth Amendment); *Pobursky v. Madera Cnty.*, 07-CV-0611, 2007 WL 4557090, at \*10 (E.D. Cal. Dec. 21, 2007) (observing that "[t]he Eighth Amendment requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable" and concluding that deprivation of bedding for one night did not rise to the level of a constitutional violation) (citing *Hernandez*, 861 F.2d at 1424).   In addition, even if Defendant Russom failed to act on Plaintiff's complaint that he was not given lunch on May 5, 2022, one missed meal does not amount to an Eighth Amendment violation.  *See Whitley*, 475 U.S. at 319 ("After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment . . . .") (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)); *Wilson v. Pima Cnty. Jail*, 256 F. App'x 949, 950 (9th Cir. 2007) (finding inmate did not suffer a serious deprivation when officer took away his lunch); *cf. Foster v. Runnels*, 554 F.3d 807, 813 n.2 (9th Cir. 2009) (denying sixteen meals over twenty three days violates the Eighth Amendment).

Fourth, with respect to Plaintiff's transport back to ADCRR, even if Defendant Cooper attempted to place a spit mask on Plaintiff, that does not rise to the level of an Eighth Amendment violation.  In addition, the evidence demonstrates that Plaintiff was placed in the wrap restraint only for the drive back to ASPC-Eyman, which took three and a half hours, and there is no evidence that Plaintiff suffered any injury from the restraint wrap.  Even if Defendant Guerrero took pictures and recorded video of Plaintiff with his personal cell phone, laughed and joked with officers about Plaintiff, and "invited the prison's captain and [sergeants] to come out and view the conditions they had placed [Plaintiff] in" and "stood around laughing and joking," none of that conduct amounts to an Eighth Amendment violation.  *See Somers v. Thurman*, 109 F.3d 614, 624 (9th Cir. 1997) ("To hold that gawking, pointing, and joking violates the prohibition against cruel and unusual punishment would trivialize the objective component of the Eighth Amendment test and render it absurd."); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)

("Verbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983") (quoting *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)).

Finally, there is no evidence that Defendant Sanchez was in any way personally involved in the events that occurred between May 5 and 6, 2022. Defendant Sanchez denies that he was assigned to the transportation team, involved in the transport, or made any decisions regarding Plaintiff's restraints, what he was allowed to have in his cell at YCDC, or what privileges he had during his overnight stay. (Doc. 128-4 at 249-50 ¶¶ 5, 12-13.)

On this record, there are no genuine disputes of material fact regarding whether Defendants violated Plaintiff's Eighth Amendment rights with respect to his transport and conditions of confinement between May 5 and 6, 2022. The Court will therefore grant Defendants' Motion for Summary Judgment as to Count One.

**VII.    Conclusion**

The Court will grant summary judgment in favor of the County Defendants as to CV-22-01118 and in favor of Defendant Acosta as to CV-22-00154.

As to CV-22-00154, the Court will deny Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment conditions-of-confinement claim in Count Four regarding outdoor recreation against Defendant Cooper only. The Court will grant the Motion in all other respects.

As to CV-22-01120, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's claims against Yuma County and the official capacity claims against the individual Defendants. As noted, the individual Defendants have filed a Motion for Summary Judgment on the merits of Counts Six and Seven, which the Court will address in a separate Order.

As to CV-22-01163, the Court will grant Defendants' Motion for Summary Judgment as to Counts One through Three. The Court will deny Defendants' Motion as to the Eighth Amendment excessive force claim in Count Four against Defendant Arriola with respect to the November 8, 2021 incident.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendant Acosta's Motion for Summary Judgment (Doc. 120) and the County Defendants' Motion for Summary Judgment (Doc. 127).

(2)    Defendant Acosta's Motion for Summary Judgment (Doc. 120) is **granted**. The County Defendants' Motion for Summary Judgment (Doc. 127) is **granted in part** and **denied in part**.

(3)    In **CV-22-00154**: Counts One, Three, and Five are **dismissed with prejudice**. Defendants Yuma County, Wilmot, Acosta, James, Vargas, Milner, Ana Duarte, Arriola, Ruelle, Walker, Silva, Gomez, Guerrero, Oberosler, Frank Duarte, Figueroa, and Flores are **dismissed with prejudice**. **The remaining claim in CV-22-00154** is the portion of the Eighth Amendment claim in Count Four pertaining to outdoor recreation against Defendant Cooper.

(4)    In **CV-22-01118**: Count Four is **dismissed with prejudice**. Defendants Yuma County, Wilmot, Milner, Cooper, Duarte, Gomez, and Guerrero are **dismissed with prejudice**. **There are no remaining claims in CV-22-01118**.

(5)    In **CV-22-01120**: Count Four is dismissed **with prejudice**. Plaintiff's official-capacity claims and Defendants Vargas and Yuma County are **dismissed with prejudice**. The **remaining claims in CV-22-01120** are the First Amendment claims in Counts Six and Seven against Defendants Quiroz, Espinoza, Wilmot, Milner, Cooper, Duarte, Gomez, Guerrero, and Oberosler in their individual capacities.

(6)    In **CV-22-01163**: Counts One through Three are **dismissed with prejudice**. Defendants Alvarez, Russom, Rendon, Cooper, Guerrero, Ruelle, Sanchez, Lopez, Aguayo, Perez, Navarro, Zepeda, and Hand are **dismissed with prejudice**. **The remaining claim in CV-22-01163** is the Eighth Amendment excessive force claim in Count Four against Defendant Arriola with respect to the November 8, 2021 incident.

(7)    Within **14 days** of the date of this Order, the remaining Defendants in CV-22-00154 and CV-22-01163 may file a renewed Motion for Summary Judgment

limited to the issue of whether they are entitled to qualified immunity on Plaintiffs' remaining claims in those cases.  Plaintiff will have **21 days** from service of the renewed Motions to respond. Defendants will then have **14 days** from service of the response brief to reply. The renewed Motion and response briefs are limited to **17 pages** and the reply brief is limited to **11 pages**.

Dated this 27th day of September, 2024.

Michael T. Liburdi

United States District Judge